### ATCHISON, T. & S. F. RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. May 5, 1909.)

No. 1,590.

1. CARRIERS (§ 38*) — INTERSTATE COMMERCE — REBATING—INTENT—WILLFULNESS.

   In a prosecution of an interstate carrier for giving a rebate on an interstate shipment of lime, constituting a departure from the established and published rate, in violation of Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847 (U. S. Comp. St. Supp. 1907, p. 880), denouncing such departure when willfully made, the intent of the carrier is of the essence of the offense.

   [Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*]

2. CARRIERS (§ 38*)—INTERSTATE COMMERCE—REBATING.

   A departure from an established and published interstate freight rate by a carrier in order to constitute a crime denounced by Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847 (U. S. Comp. St. Supp. 1907, p. 880), must be willful.

   [Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*]

3. CARRIERS (§ 38*) — INTERSTATE COMMERCE — REBATING—INDICTMENT—"CONCESSION."

   Under Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847 (U. S. Comp. St. Supp. 1907, p. 880), making the willful giving of concessions by interstate

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

carriers from the established and published tariff rates an offense, an indictment alleging that the established and published rate per car for bulk lime between two points was $70 per car of 40,000 pounds minimum, and that defendant charged and received for a specified car the sum of $64.75 and no more, sufficiently charged that defendant granted a "concession" prohibited by the statute, though the count did not use the word "concession" to describe the alleged rebate.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*

For other definitions, see Words and Phrases, vol. 2, p. 1386.]

**4. CARRIERS (§ 38*)—REBATING—INDICTMENT—EVIDENCE—VARIANCE.**

A tariff sheet showing an established and published rate on bulk lime between two points of $3.50 per ton in car load lots of not less than 40,-000 pounds did not sustain an indictment against the carrier for granting a concession alleging that the established rate was $70 a car of 40,000 pounds minimum.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*]

**5. CARRIERS (§ 38*)—INTERSTATE COMMERCE—REBATING—INTENT—EVIDENCE.**

Where, in a prosecution against a carrier for alleged rebating on shipments of bulk lime, it was shown that the regular published rate was $3.50 per ton, 40,000 pounds minimum, that the value of the lime was $3.50 a ton at the point of shipment, and that the carrier had accepted in settlement sums varying from 35 cents to $14.35 per car less than such established rate, evidence that the shipper had claimed that each of the cars had been loaded with at least the minimum amount, but that various amounts had been lost in transit, and that the carrier had not exacted freight on the amount so lost, was admissible as showing absence of the carrier's intent to grant a concession from the established freight rate.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*]

In Error to the District Court of the United States for the Southern Division of the Southern District of California.

For opinion below, see 163 Fed. 111.

Robert Dunlap, T. J. Norton, W. W. Camp, A. H. Van Cott, U. T. Clotfelter, and Gardiner Lathrop, for plaintiff in error.

Oscar Lawler and Robert T. Devlin, U. S. Attys.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The indictment in this case was based upon the act of Congress known as the Elkins act, approved February 19, 1903, entitled "An act to further regulate commerce with foreign nations and among the states." Act Feb. 19, 1903, c. 708, 32 Stat. 847 (U. S. Comp. St. Supp. 1907, p. 880).

We are in entire accord with the learned judge of the court below in his holding that this act, as well as all other acts upon the same subject, should be so construed and enforced by the courts as to promote their policies and extirpate the evils against which they are directed. Yet in respect to their criminal features this can only be done upon valid indictment, and in accordance with the established principles governing criminal prosecutions. The indictment in the present case contains 66 counts, upon each of which the plaintiff in error, defendant below, was found guilty by the jury, and upon each of which it was sentenced by the judgment brought here for review upon vari-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ous assignments of error. All of the counts are similar and involve the same questions of law and similar questions of fact, so that it will be sufficient to set forth the substance of the first count, which, after stating the corporate character of the defendant, and that it is, and was at all the times mentioned in the indictment, a common carrier subject to the provisions of the interstate commerce act, and engaged in the transportation over its continuous line of road, of freight and property, in interstate commerce, from the town of Nelson, in the territory of Arizona, to the town of Barstow, in California, and all stations on the said continuous line south of Barstow, charged: That on the 15th day of June, 1905, the defendant in the manner and form acquired by law established and filed with the Interstate Commerce Commission, and had, as required by law, published, a tariff of rates of fare and charges for the transportation of freight and property in interstate commerce, which was in force from June 15, 1905, to July 16, 1906, upon the defendant's continuous line of route between the towns of Nelson and Barstow, and all stations on said line south of Barstow within the state of California. That the tariffs so established, filed, and published by the defendant company plainly stated the places upon its railroad lines between which property would be carried, and contained the classification of freight at said times in force, and further stated the quantity of the respective commodities designated in said classification to which each of the rates of fare and charges therein specified were applicable, and in connection with which said respective rates were to be established.

"That at all the times between said 15th day of June, in the year 1905, and the 16th day of July, in the year 1906, the lowest total lawful rate and charge established in said tariff by said corporation, common carrier, the Atchison, Topeka & Santa Fé Railway Company, and in force on its said continuous line and route for the transportation of bulk lime in car load lots from said town of Nelson, in said territory of Arizona, to the said town of Barstow, in the state of, California, was, as shown by said tariff so established, filed and published by said corporation common carrier, as aforesaid, seventy (70) dollars for each car load lot of bulk lime shipped and transported over said continuous line and route from said town of Nelson, in the territory of Arizona, to said town of Barstow, Cal., or to any station on said line and route south of said town of Barstow, in the said Southern District of California, as aforesaid. That the Grand Canyon Lime & Cement Company at all the times herein mentioned was, and still is, a corporation organized and existing under and by virtue of the laws of the state of California, having its principal place of business at the city of Los Angeles, county of Los Angeles, division and district aforesaid, and also having a place of business and factory at the said town of Nelson, in the territory of Arizona.

"And the grand jurors aforesaid, on their oath aforesaid, do further present: That heretofore, on the 17th day of June, in the year 1905, said Grand Canyon Lime & Cement Company, a corporation as aforesaid, delivered to said the Atchison, Topeka & Santa Fé Railway Company, railroad corporation and common carrier as aforesaid, at the said town of Nelson, in said territory of Arizona, for shipment and transportation by the said common carrier and its railroads, over said line and route, to J. S. Schirm, at the city of Los Angeles (said city of Los Angeles being a station on the line and route of said common carrier south of said town of Barstow, Cal.), within the Southern division of the Southern district of California, a certain car load lot of bulk lime, which said lime was then and there contained in car of the said the Atchison, Topeka & Santa Fé Railway Company No. 17,256, which said car load lot of bulk lime was transported in said car No. 17,256 by said railway company by way of and over said continuous line and route from said town of Nelson,

territory of Arizona, through and by way of said Southern Division of the Southern District of California, to said city of Los Angeles. That the lawful amount of freight due and payable to said Atchison, Topeka & Santa Fé Railway Company, common carrier as aforesaid, under, pursuant to, and in accordance with said tariff so established, filed, and published by said railroad corporation as aforesaid was the sum of seventy (70) dollars. That said Atchison, Topeka & Santa Fé Railway Company, corporation, common carrier, as aforesaid (notwithstanding the existence of said lawful rate of seventy [70] dollars for the transportation of said car load lot of bulk lime as aforesaid), did charge, demand, and receive from the said J. S. Schirm for the transportation and shipment of said car load lot of bulk lime from said town of Nelson, in the territory of Arizona, to the said city of Los Angeles, in the state of California, the sum of sixty-four and seventy-five one hundredths (64.75) dollars, and no more, which said sum of sixty-four and seventy-five one hundredths (64.75) dollars was at the city of Los Angeles, within the Southern Division of the Southern District of California, paid by said J. S. Schirm to said the Atchison, Topeka & Santa Fé Railway Company on the 22d day of June, in the year 1905, for such transportation."

The foregoing constitutes the charging part of the first count of the indictment.

The Elkins act in its first section provides, among other things:

"That anything done or omitted to be done by a corporation common carrier subject to the act to regulate commerce and the acts amendatory thereof, if done or omitted to be done by any director or officer thereof, or any receiver, trustee, lessee, agent or person acting for or employed by such corporation, would constitute a misdemeanor under said acts, or under this act, shall also be held to be a misdemeanor committed by such corporation, and upon conviction thereof it shall be subject to like penalties as are prescribed in said acts or by this act with reference to such persons, except as such penalties are herein changed. The willful failure upon the part of any carrier subject to said acts to file and publish the tariffs or rates and charges as required by said acts or strictly to observe such tariffs until changed according to law shall be a misdemeanor, and upon conviction thereof the corporation offending shall be subject to a fine not less than one thousand dollars nor more than twenty thousand dollars for each offense; and it shall be unlawful for any person, persons, or corporation to offer, grant or give or to solicit, accept or receive any rebate, concession or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereto whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced. Every person or corporation who shall offer, grant or give or solicit, accept or receive any such rebates, concession, or discrimination shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not less than one thousand dollars nor more than twenty thousand dollars. * * * In construing and enforcing the provisions of this section the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier acting within the scope of his employment shall in every case be also deemed to be the act, omission, or failure of such carrier as well as that of the person. Whenever any carrier files with the Interstate Commerce Commission or publishes a particular rate under the provisions of the act to regulate commerce or acts amendatory thereto, or participates in any rates so filed or published, that rate, as against such carrier, its officers or agents in any prosecution begun under this act shall be conclusively deemed to be the legal rate, and any departure from such rate, or any offer to depart therefrom, shall be deemed to be an offense under this section of this act."

On the trial the government introduced the tariff established by the defendant company and filed with the Interstate Commerce Commis-

sion, showing the rate over its line of road on line from Nelson to the stations referred to in the indictment to be 350 cents per ton for a minimum car load weight of 40,000 pounds. It was also shown on the trial that during the time covered by the indictment—more than a year—384 cars or thereabouts of lime, aggregating between 9,000 and 10,000 tons, and on which the total freight amounted to about $32,000, were shipped from Nelson over the defendant's road, concerning 66 of which cars (those embraced by the indictment) a question arose between the shipper and the railroad company in respect to lime claimed by the shipper to have been lost therefrom in transit, amounting in value to from 35 cents to $14.35 a car, and aggregating less than $500. Frederick P. Gregson, the freight agent of the defendant company having charge of such matters, was called as a witness by the government, and was examined by its counsel as well as by the counsel for the railroad company, and in respect to those claims made by the shipper for those losses gave testimony tending to show that in respect to each of the 66 shipments covered by the indictment the shipper complained to the company that the full minimum car load weight of 40,000 pounds had been loaded into the cars of the plaintiff in error at Nelson, and that a freight bill for the minimum car load, according to the tariff of $70, had been made, and that that amount was demanded by the defendant company for freight on each of those cars, but that as a matter of fact, according to the railroad company's scales at or near the destination of the shipment, it appeared that each of the 66 cars contained less than 40,000 pounds of lime, in consequence of which the shipper insisted that the company had lost in transit his lime to the amount of the difference between 40,000 pounds and the weight so shown by the scales, and insisted that he should not lose the lime, and at the same time pay freight on the lime so lost. That it cost $3.50 per ton to produce the lime at Nelson, and as the freight, according to the tariff, was $3.50 per ton, the shipper offered to waive any claim for the loss of the lime if the company would waive demand for the freight on the amount so claimed to have been lost, and that a compromise was made between the witness acting for the railroad company and the shipper on that basis, and that the company accepted payment only on the lime actually transported at the rate of $3.50 a ton. Other witnesses gave testimony tending to corroborate that of Gregson, all of which evidence was subsequently, on motion of counsel for the government, withdrawn from the consideration of the jury and stricken out, and the jury subsequently instructed, in part, as follows:

"The parties having stipulated that the government's Exhibit No. 5 is a copy of the tariff filed by defendant with said commission (Interstate Commerce Commission), said exhibit was at the times mentioned in the indictment its legal tariff, under and by virtue of which the rate of freight on lime in car load lots from Nelson to points on its line south of Barstow is fixed at $3.50 per ton, applicable to quantities of not less than 40,000 pounds, or 20 tons, and that said tariff was binding and conclusive upon the defendant, and it could not by any means whatever lawfully charge or collect for the transportation of any of the property mentioned in the indictment any greater or less rate than that specified in said tariff. You are further instructed that, if the defendant did accept for the transportation of said lime a less rate than that fixed by its legal tariff, it is wholly immaterial whether the difference between

the tariff rate and the rate so accepted was large or small. You are further instructed that, if you find that the defendant did accept and receive for the transportation of said lime a less rate than that fixed by said tariff, you need not inquire or determine whether or not the defendant intended thereby to violate the law, for such intention or lack thereof upon its part is entirely immaterial."

These rulings and instructions of the court below, as well as the instructions hereinafter referred to, were excepted to by the defendant, and are here assigned as error.

The indictment does not charge, nor in the record is it anywhere contended, that there was in the first place any agreement or understanding of any nature that the defendant should carry the lime at any departure or concession from the established rate; and, while it is entirely true that it was the purpose of the statutory enactments upon the subject to cut up by the roots the entire system of rebates and discriminations, however made, by railroad companies in favor of particular localities, special enterprises, favored corporations, or individuals, and that the courts should be astute to discover and severely punish any and every such unlawful and wicked act, it was not, we think, the purpose of Congress to punish as a crime any innocent act committed by a corporation any more than by an individual.

The view taken by the trial court of the nature of the charge made by the indictment in its ruling on granting the government's motion to strike out all of the evidence tending to show that the deductions made from the original freight bills by the defendant's agent, varying from 35 cents to $14.35 on the 66 car loads in question because of the contention of the shipper that he was not legally bound and should not in justice pay freight on lime lost by the company in transit and which it did not transport, is shown by the ruling itself, where the learned judge said:

"I hold that the acceptance by the defendant of a less sum of money than that named in its tariff for the transportation of the property described in the indictment, if there has been such acceptance, was a departure from the legal rate, and that it is no justification for such a departure, nor is it any defense to a prosecution therefor that the acts of the carrier were done in compromise of claims for loss of property in transit."

Passing, for the moment, the question whether the collection of $3.50 a ton for all the lime in fact transported by the railroad company for the shipper between the stations mentioned is in law or fact any departure from the established rate of $3.50 a ton on that commodity between those stations, it is plain, we think, that if the charge upon which the defendant was being tried was, as indicated in the ruling of the court from which we have quoted, "a departure" by the defendant from its established rate, then clearly the intention with which such departure was so made was of the essence of the offense, because made so by the statute itself in expressly denouncing such departure when "willfully" made. When the court below, however, came to charge the jury, it instructed them that to constitute the offense charged in the first count of the indictment "five things are necessary," the first three of which need not be referred to, since they were stated by the court to be admitted. The fourth and fifth were stated by the court to be as follows:

"Fourth. That the defendant, as alleged in said count, filed with the Interstate Commerce Commission a tariff or schedule of rates, of which United States Exhibit 5 is a copy, and that the lawful amount of freight due the defendant on said shipment under said tariff was $70.

"Fifth. That said amount of $64.75 was paid by said Schirm, and that its acceptance by defendant was a concession by defendant to said Schirm whereby said lime was transported at a less rate than that named in said tariff."

If, as we take it, by the word "concession" in these instructions the court meant the "departure" from the tariff rate referred to in its above quoted ruling in striking out the evidence referred to, the same observations are of course, applicable to such "concession" as to the departure from the tariff rate; that is to say, it must have been "willful" to constitute a crime under the statute. Although the charging part of count one of the indictment does not use the word "concession," it does allege, in effect, that the rate established and published by the defendant per car from Nelson to Los Angeles was $70, and that, notwithstanding that sum was the lawful rate for the transportation between those points for such car loads of lime, the defendant did charge, demand, and receive for the car referred to in count one the sum of $64.75, and no more. Since the defendant, of course, knew and must be held to have known the tariff of rates established and published by itself, the averment that, notwithstanding the alleged rate of $70 for the car referred to, the defendant, in fact, charged and accepted $64.75 only, would seem to be sufficient to constitute the concession prohibited by the statute. The name is of but little moment. The essence of the thing is what characterizes and identifies it. Therefore we conclude that the objections made by the defendant to the sufficiency of the indictment are not well taken. But the established and published tariff introduced by the government does not support that charge. The tariff rate as established and published by the defendant for the transportation of bulk lime between Nelson and Los Angeles was $3.50 a ton in car load lots of not less than 40,000 pounds. It is true that, to entitle a shipper to that rate, he was required to put into the car at least 40,000 pounds; and it is also true that, by loading that quantity, he was entitled to that rate regardless of how much the carrier might deliver at the point of destination. If the shipper put in the car more than 40,000 pounds, he was not entitled to a rate of $70. In that event he was required to pay not $70 only, but $3.50 a ton on the quantity actually loaded and delivered; that is to say, $3.50 a ton was the established and published rate—not $70 a car. It is true that the freight would amount to $70 in cases where exactly 40,000 pounds were loaded and transported; but that was a mere incident. It might be more and it might be less—more when more than 40,000 pounds were loaded and transported, and less where at least 40,000 pounds were loaded, but not that amount was transported and delivered at the point of destination, the rate, however, all the time remaining the same, to wit, $3.50 a ton. Gregson testified, among other things, that the shipper explained to him how the loading was done at Nelson, which was a remote and unimportant station, and convinced him that at least 40,000 pounds of lime were loaded into every one of the cars shipped from that place. The ship-

per was, therefore, as has been said, legally entitled to have each of those shipments transported at the rate fixed in the defendant's tariff, to wit, at the rate of $3.50 per ton. The loss of some of the lime by the carrier in transit could not legally or justly deprive the shipper of the rate applicable to the minimum car load weight, any more than it would confer upon the carrier the right to charge for the transportation of that which it did not transport. The loss in transit was the fault of the carrier, for which loss it, and not the shipper, must be held to be the sufferer. Assuming, as, of course, we must in passing upon the rulings of the trial court, the facts to be as the evidence tended to prove them, we do not see how under the circumstances testified to it can fairly be said that the shipper in this case had his lime transported at a less rate than the regularly established and published rate. He was entitled to the car load rate of $3.50 a ton because he loaded at least 40,000 pounds in each of the cars in question, and he was not legally or equitably bound to pay freight on any of the lime which the carrier lost in transit and failed to deliver at the point of destination.

Of course, if all of this was a mere pretense, and if, in truth, it constituted but a concocted scheme or device of the defendant for the purpose of departing in any way from its established and published schedule or making to the shipper any concession of any character, the crime denounced by the statute was committed; but that was a question of fact for the jury, in the consideration and determination of which the evidence stricken out was important to the defendant. While "courts rightly are keen to penetrate an innocent appearing device to reach an illegal transaction," said the Circuit Court of Appeals for the Seventh Circuit in a case involving an alleged criminal violation of the Elkins act, "they should also be alert to save a lawful act, though it be hid under a false cover." Chicago & A. Ry. Co. v. United States, 156 Fed. 558, 560, 84 C. C. A. 324. And in the case of Camden Iron Works v. United States, 158 Fed. 561, 564, 85 C. C. A. 585, which was also based on the Elkins act, the Circuit Court of Appeals for the Third Circuit said:

"It is pertinent to remark that the legislation which has been under examination is highly penal in its character, and while it is the duty of the courts to so construe its terms as to suppress, if possible, the mischief against which it is directed, it is no less their duty to see to it that no person, natural or artificial, shall be held guilty of a crime upon an interpretation of the statute creating it which does not appear with at least a reasonable degree of certainty to be the correct one."

A similar right of a defendant charged with a similar crime under the same statute was very recently under the consideration of the Supreme Court in the case entitled New York Central & Hudson River Railroad Company v. United States (decided February 23, 1909) 212 U. S. 481, 29 Sup. Ct. 304, 53 L. Ed. ——. There the charge was against the railroad company, its general and assistant general traffic manager. The indictment, among other things, charged the making and publishing of a through tariff rate upon sugar by certain railroad companies, including the New York Central & Hudson River Company, fixing the rate at 23 cents per 100 pounds from New York City

to Detroit, and charging the railroad company's general and assistant general traffic manager with entering into an unlawful arrangement with certain sugar refining companies and the consignees of the sugar shipped by them, whereby it was agreed that for sugar shipped over the line whereon the full tariff rate was paid the railroad company should subsequently give a rebate of 5 cents for each 100 pounds. The indictment charged that during the months. of April and May, 1904, shipments were made under this agreement and the regular tariff rates paid, and that on the 14th of July of that year a claim for a rebate in the sum of $1,524.99 was presented by the agents of the shipper and consignees, and paid on the 31st day of August to one Palmer, agent of the sugar company, for the benefit of the shippers and consignees. The foregoing were the allegations of the second count of the indictment, and similar averments were made in other counts. It appeared that the sugar refining companies were engaged in selling and shipping their produce in Brooklyn and Jersey City, and that W. H. Edgar & Son were engaged in business in Detroit, where they were dealers in sugar. By letters between Palmer, in charge of the traffic of the sugar refining companies and of procuring rates for the shipment of sugar, and the general and assistant traffic managers of the railroad company, it was agreed that Edgar & Son should receive a rate of 18 cents per 100 pounds from New York to Detroit. The letters referred to showed that this concession was given to Edgar & Son to prevent them from resorting to transportation by water route between New York and Detroit, thereby depriving the roads interested of the business, and to assist Edgar & Son in meeting the severe competition with other shippers and dealers. The shipments were made accordingly, and claims for rebate made on the basis of a reduction of 5 cents a 100 pounds from the published rates. These claims were sent to the assistant freight traffic manager of the railroad company by Palmer, the agent of the sugar companies, and then sent to one Wilson, the general manager of the New York Central and Fast Freight Lines at Buffalo, N. Y. Wilson returned to the assistant traffic manager of the railroad company a cashier's draft for the amount of the claim, which draft was then sent to the agent of the sugar companies and his receipt taken. It was stipulated that these drafts were ultimately paid from the funds of the railroad company.

One of the points made by the plaintiff in error and considered by the Supreme Court is thus stated by the court in its opinion:

"It is further contended that the court below erred in its reference to the absence of the witness Embleton, and the nonproduction of books in which entries were made concerning the transactions in question. It appears that Embleton was a clerk in the employ of Wilson, and had charge of the books in which these transactions were entered, that he did not appear at the trial. having left because of sickness, nor were the books produced. The comment objected to was made in connection with this paragraph of the charge:

" 'On this question of intent also, gentlemen, it is competent for you to take into consideration the method. in which these transactions were carried on. The letter from Palmer to Guilford was headed private and confidential. It will be proper for you to take into consideration the fact, if you believe the evidence in the case, that the method of making these payments, instead of being by a direct check drawn at Buffalo by or on behalf of this defendant, was by purchasing a draft drawn by the Bank of Buffalo upon the Chemical

Bank in favor of Mr. Palmer; and you may take into consideration upon that question the evidence in this case that the original claims presented by Palmer to Pomeroy and sent by Pomeroy to Wilson have been destroyed, and the fact that when Embleton, the man in charge of the shipments, left the employment there a book containing entries in reference to these claims disappeared, and that Mr. Wilson testified in this case that he did not know where it was.

" 'Now, it is for you to say, gentlemen, whether these occurrences and these facts are consistent with innocence or with guilt, because if a man carries on an act, or any person does anything which upon its face is apparently unlawful, and he does it in a furtive and secret manner, showing that his intention while he does the act is to do it in such a way as to conceal it, the jury may draw the inference from that fact, if they see fit—they are not obliged to, but they may if they see fit—that the intention with which the act was done was to perform an illegal or a criminal act.'

"We do not perceive any prejudicial error in this charge. It simply amounted to permitting the jury to consider the circumstances enumerated as bearing upon the guilty purposes of the parties charged in the indictment. It left to the jury to attach such weight as they saw fit to the circumstances of Embleton's absence and the nonproduction of the books. It is to be noted in this connection that the judge in the latter portion of his charge, at the request of the defendant, said: 'There is no evidence that the defendant corporation or those who controlled its corporate action destroyed or failed to produce upon the trial any paper for which the government has asked.' "

The question of intent entered into the charge made by the indictment against the defendant in the present case, and, that being so, it necessarily results that the court below was in error in withdrawing from the consideration of the jury the evidence to which reference has been made, and in the giving of its instructions.

The judgment is reversed and cause remanded for a new trial.