## SAVANNAH, FLORIDA AND WESTERN RAILWAY COMPANY *v.* COMMERCIAL GUANO COMPANY.

1. Where a consignee of freight refuses to receive goods on account of damage done to them in the hands of the common carrier, and the goods are subsequently thrown back on the hands of the consignor, the latter has a right to bring an action for such damages against the carrier.
2. Where a railroad company receives on its cars from a consignor, at its warehouse in a city, freight to be conveyed from its depot in another portion of the same city to a point of destination beyond its line, which cars are furnished at the request made of it by the consignor, and where the entire freight charges are paid by the consignor to such company for transportation of the goods from its depot, this company is the initial carrier, and as such is responsible for any liability for the loss or damage of the goods in the course of transportation. This is true notwithstanding another railroad company owned the spur-track leading from the warehouse of the consignor to a point intermediate between there and the depot above mentioned, and received compensation for trackage or for the transfer over its spur-track, it appearing that the latter company received no portion of the freight charges, and did not undertake a through transportation of the goods.
3. The facts in this case demanded the verdict found by the jury; and if there were any errors in the rulings or charges of the court complained of, they were immaterial; and the court did right in overruling the motion for a new trial.

Argued January 27, 28, — Decided March 22, 1898.

Action for damages. Before Judge Norwood. City court of Savannah. July term, 1897.

*Erwin, duBignon, Chisholm & Clay,* for plaintiff in error.
*Charlton, Mackall & Anderson,* contra.

LEWIS, J. The Commercial Guano Company sued the Savannah, Florida and Western Railway Company for damages

for alleged breach of duty as a common carrier, in failing to safely transport and deliver 25 tons of fertilizers shipped from Savannah over the line of the company as the initial carrier to certain parties at Peacock's landing on the Chattahoochee river, a point beyond its line of railway. The plaintiff in this suit was the consignor. The freight was delivered in good condition to a steamboat company on the Chattahoochee river. It arrived at the point of destination within a reasonable time, and on Sunday, while it was raining and the river was rising, was there unloaded and left on the bank of the river without notice to the consignees, and was soon after submerged by the river, and thus damaged to such an extent that the consignees refused to receive it. The defendant denied liability, and contended that it was under no obligation with reference to the consignment save as an intermediate carrier; that the initial carrier was the Central Railroad Company, and that defendant's obligation was discharged by the delivery of the freight in good order at the terminus of its line to the connecting carrier; also, that the owners of the steamboat, their agents and servants, exercised due diligence in the delivery of the freight, and that the submerging of the fertilizers by the river was an act of God which could not have been foreseen.

The following facts in reference to the shipment appear from the testimony: The Central Railroad Co. owned wharves in the western section of the city of Savannah, and the depots of the S., F. & W. Co. are in the eastern portion of the city. From the wharves of the Central to the warehouse of the consignor runs a track owned by the Central. At these wharves the S., F. & W. Co. had a freight-agent. The consignor, desiring to ship guano consigned to certain parties at Peacock's landing on the Chattahoochee river, made a request of this agent for cars to be loaded with the guano for the purpose of this shipment. These cars were accordingly furnished by the S., F. & W. Co. There was a general understanding or agreement between the consignor and the Central, that the latter should receive a certain stipulated amount per car from the former for the use of this spur-track leading from the warehouse to the wharves. This charge was known as trackage. The Central also owned

592    SAVANNAH RY. CO. v. COM. GUANO CO.    (103

the track leading from the wharves to the tracks of the S., F. & W. Co. For a transfer of freight over this portion of its track, by an understanding between it and the S., F. & W. Co., a fixed compensation was to be paid by the latter. These were known as transfer charges. The consignor had nothing to do with the transfer charges, or with the agreement between the two companies in reference thereto. The S., F. & W. Co. had nothing to do with the expenses for trackage above mentioned, and no concern in the contract made between the consignor and the Central in reference to such charges. In this case receipts were introduced, given by the Central to the consignor for trackage from warehouse to wharf, $1.00 per car. There was also introduced a freight bill receipted, made out by the S., F. & W. Co. against the Commercial Guano Company, upon which bill was stated the consignees of the goods, place of destination, the number of sacks of fertilizers, the weight, and the total amount of freight charges from Savannah to Peacock's landing. There was also in evidence a receipt given by the agent of the Central, of which the following is a copy:

"Savannah, Ga., Feb. 3, 1894.

Received from Commercial Guano Company, in good order, 10 tons, 100 sacks, Ga. Bone Comp., consigned to W. T. Creville and D. M. Shaw; destination Peacock's landing, Ga., Chattahoochee river. In car J. T. & K. W. No. 330.

————————————Agent.

Charges $———————— prepaid.        By J. Dooner."

For this shipment it appeared from the testimony that the trackage charge above specified was the only charge made against the consignor by the Central, and that the only dealings between the two were simply for trackage. The Central did not participate at all in the freight charges from Savannah to Peacock's landing, which were paid by the consignor to the S., F. & W. Co. The receipt given by the Central to the consignor, according to the testimony of witnesses both for the plaintiff and the defendant, was the same as an ordinary dray receipt; that is, such a receipt as would be given by a drayman in transferring goods from the house of a consignor to the depot of a railroad company for transportation over its line. Upon the pre-

sentation of such a receipt by a consignor to such railroad company, the custom is, under the evidence, for the company, upon demand, to give the consignor a bill of lading for the freight. The testimony for the defendant company showed that it sometimes collected freight charges as an intermediate carrier, but that this was an exception to the general rule, and that when this was done the collection would be made, not of the consignor, but of the carrier from which the S., F. & W. Co. received the freight; this carrier collecting the freight from the consignor. This was occasionally done on shipments from the north over ocean steamship lines to be transported over the lines of the S., F. & W. Co. as an intermediate carrier. The consignor did not demand a bill of lading for the shipment in this case, but stated that it had received them from the S., F. & W. Co. for other shipments made in the same way.

There was a verdict for the plaintiff for the amount of damages shown by the evidence. The defendant made a motion for a new trial, which was overruled, and it excepted.

1. Exception was taken by the plaintiff in error to the following charge of the court: "Without going into the reason therefor, I state to you that under the law (and you will be guided by it, whether I am right or wrong) the consignor had the right to sue; he is properly in court." Under the facts of the present case, there was no error in this charge. It is true that when a person residing in one place orders goods shipped to him from another place by a railroad company, a delivery of goods by the vendor to the company is, in law, a delivery to the purchaser. If the contract were that the vendor should deliver the goods where the purchaser did business, a delivery to the carrier would not be a delivery to the purchaser. The only concern, however, which the carrier has touching these relative duties and rights of a vendor and vendee is to be protected in the event of a suit by one against any subsequent liability to the other for the same cause of action. In the event of liability by the carrier, the only question which remains for determination is whether or not the plaintiff who sues has been damaged, and, if so, to what extent. If the seller had completely complied with his contract with the purchaser by

38

a delivery of goods to the carrier, and they afterwards became damaged while in the hands of the carrier, it was certainly in the power of the consignor and consignee, by mutual consent, to rescind the contract of sale; and it does not lie in the mouth of the carrier to complain of such rescission, when it was brought about by its own wrong. The freight in this case having been thrown back upon the hands of the consignor, and it consequently having sustained whatever loss there was, there can be no question about its right to sue.

2. The main contest in this case arises upon the question as to whether the Central or the Savannah, Florida & Western Railway Company was the initial carrier charged with the undertaking to ship the guano to the point of destination. It is conceded that one or the other of these railroads was responsible for whatever liability, if any, was incurred on account of damage to the freight in the course of transportation. Upon this issue there is really no material conflict in the testimony; and it practically becomes a question of law as to whether any liability of the defendant in this case has been established by the testimony. In the case of *Falvey* v. *Georgia Railroad,* 76 *Ga.* 600, this court said: "When goods are received by a carrier to be transported beyond the terminus of its line, and delivered at a particular place and to particular persons at such place of destination, without more, a contract is implied that the carrier will cause such goods thus delivered to it to be carried to the place of destination safely, without damage or hurt, and it will be liable to the consignor for failure to perform its contract, for any damages which may arise therefrom to the party injured. In order to ascertain if any contract was made by the first carrier with the shipper to transport beyond its line to the place of destination, the bill of affreightment may be looked to; aliunde evidence may also be introduced, such as the payment of all the freight charges to the first carrier, the way-bill, and designation of the lines of road over which the goods are to go, and the apportionment by the first carrier of the amount which each line is to be paid for such carriage; and from these facts the jury may determine whether any contract was made, express or implied, whereby the first

carrier engaged to carry the goods to the point of destination." The initial carrier is not necessarily the one that first receives the goods from the shipper, but it is the one that first receives the goods *with an undertaking to transport 'and safely deliver them to the consignee at the place of destination.* It is, therefore, a matter of but little moment as to which one of these two railroads the goods were first delivered by the consignor. Were it a material question, we would be inclined to hold, under the facts of this case, that when the freight was placed upon board the cars of the S., F. & W. Co. at the warehouse of the consignor, it was then delivered to that railway company, although its cars were on the track of the other company, especially in view of the fact that these cars were furnished by the former company at the request of the consignor.

But the real question is, which one of these two companies undertook with the consignor, under the facts of this case, to transport this freight from the place of shipment to the point of destination. The place of shipment was Savannah; the point of destination was Peacock's landing on the Chattahoochee river beyond the terminus of the line of either company. After a careful review of the entire testimony in the record, we have been unable to see how the Central Railroad Company can possibly be charged with any liability for these goods for their transfer to the point of consignment. The only testimony that tends to show such an undertaking was the receipts introduced by the defendant company, given to the consignor by the Central Railroad Company. These receipts simply showed that the goods were received by this company in good order, indicated who were the consignees and to what place the freight was to be shipped. There is nothing in the receipts which shows any undertaking by the Central Railroad Company to ship the goods to the point of destination. The parol evidence in explanation of these receipts did not in any way contradict their terms. We do not think the receipts bear the construction that they were a contract for through shipment of freight; if they were intended as such, they were ambiguous, and open to explanation by aliunde testimony. In the light of that evidence, the receipts furnished no basis whatever of liability for

this. shipment against the Central Railroad Company. The evidence showed that the receipts were nothing more than such as would be given by any ordinary drayman upon receiving goods at the place of business of a consignor for the purpose of delivering them to the common carrier for transportation. It is true that a drayman is a common carrier, and we do not mean to rule that he can not by contract undertake with a shipper to become liable for the safe transportation of goods over the lines even of railroads to the point of destination; but there is absolutely no evidence that there was any such undertaking on the part of the Central Railroad Company in this case. In the light of all the evidence on the subject, we are unavoidably led to the conclusion that the Central Railroad Company undertook simply to transfer the goods from the warehouse of the consignor to the tracks of the S., F. & W. Co. The only contract made between the consignor and the Central Railroad Company was one previously entered into, of a general nature, under which the former was to pay the latter for the use of its track at the rate of $1.00 per car whenever its track was desired simply for transfer purposes. With this trackage charge the S., F. & W. Co. had nothing to do.

On the other hand, a proper construction of the entire testimony points to the conclusion that the S., F. & W. Co. was the carrier that undertook a through transportation of this freight. It furnished the cars at the warehouse of the consignor for this purpose; it received from the consignor directly the entire freight charges from its depot in the city of Savannah to the place of consignment. According to the testimony of the agent of that company, not one cent of these charges was paid the Central Railroad Co. It is true that for the transfer from the wharves of the Central to the tracks of the S., F. & W. Co., the latter paid the former an "arbitrary" or definite amount fixed by agreement between the two, with which the consignor had nothing to do, and the amount of which was not in any way dependent upon the freight charges for through transportation. It is also true, according to the evidence introduced by the defendant, that it sometimes collected freight charges as an intermediate carrier; but when this was done, the collection was

not made of the consignor, but of the line delivering the freight to this company. Manifestly when the entire freight charges are collected by an intermediate carrier, the connecting line delivering to such carrier is entitled to its pro rata part of the freight charges. In this case, when the entire charges were collected, not of the Central Railroad Company but of the consignor, they were subject to apportionment, not between the Central Railroad Co. and the S., F. & W. Co., but between the latter company and other lines beyond its terminus. Indeed there is no pretence that we can gather from the testimony that when the collection of freight charges in this case was made, it was done as an intermediate carrier; but they were collected by the company as the initial carrier of the goods to be shipped as directed by the consignor. The case of *Western & Atlantic Railroad Co.* v. *Exposition Cotton Mills*, 81 *Ga.* 522, was a suit against a railroad as one of the connecting roads of a continuous line. The goods were shipped from Boston to Atlanta, and were to be delivered to the plaintiff by the railroad receiving them. They reached Atlanta over the line of defendant's road, and by that road were transferred to the plaintiff over the tracks of the Georgia Pacific Railway Co., two and one quarter miles in length. Defendant made out its freight bill at Atlanta against the consignee, who paid the charges. It was held in that case that this did not make the Ga. P. Co. the last road receiving the freight, and especially as the W. & A. Co. had received the whole freight charges.

3. It was further contended in behalf of the plaintiff in error, that the steamboat company exercised due diligence in the delivery of the freight, and that the submerging of the guano by the river was an act of God which could not have been foreseen. The goods were placed upon the bank of the river at a point below high-water mark, while it was raining and the river was rising, and where they were in imminent danger of being submerged on account of a freshet that was threatened at the time they were unloaded from the boat. No necessity appeared for a discharge of the freight at this particular time. It could have been carried on, and kept until a return trip of the boat. The casualty which caused the injury to the

goods may be regarded as an act of God, but the carrier is not protected on this account where he could have foreseen the happening of the event, or by the exercise of due diligence could have provided against such an occurrence. In the case of *Richmond & Danville R. R. Co.* v. *White & Co.*, 88 *Ga.* 805–6, this court said, that "in order for the carrier to avail himself of the act of God as an excuse, the burden of proof is upon him to establish, not only that the act of God ultimately occasioned the loss, but that his own negligence did not contribute thereto, for 'in cases of loss the presumption of law is against him.'" Charged as it is with the duty of extraordinary diligence, we think the evidence in this case demanded a verdict finding a liability for the damages that had been sustained by the consignor.

There were several grounds in the motion for a new trial, embracing exceptions to the charge and rulings of the court on the trial; but under the view we take of this case, it is unnecessary to consider them further than to say that they were immaterial. If any errors were committed, a correction of them could not legally change the result that was reached by the jury.      *Judgment affirmed.     All the Justices concurring.*