5712.   LAMB, receiver, *v.* MITCHELL & COMPANY.

1. If from the market value of a commodity at destination the freight to that point, added to the cost of converting the commodity into cash, be deducted, the resulting balance will show with reasonable certainty the value of the commodity at the point from which the shipment moved.

2. Where a carrier is sued for loss or destruction of goods in transit, resulting from unreasonable delay in delivery, the defense that the delay was caused by an unprecedented flood or some other act of God will not avail where it appears that the delay was attributable not merely to this cause, but largely to the negligence of the carrier.

3. The evidence was sufficient to authorize the verdict.
DECIDED FEBRUARY 6, 1915.

Action for damages; from city court of Thomasville—Judge W. H. Hammond.   April 15, 1914.

*Rosser & Brandon, J. H. Merrill,* for plaintiff in error.
*Snodgrass & MacIntyre,* contra.

WADE, J.   W. H. Mitchell & Company brought suit against the Atlanta, Birmingham & Atlantic Railroad Company and E. T. Lamb, receiver thereof, alleging, that the plaintiffs, on March 25, 1913, delivered to the said railroad company at Thomasville, Georgia, a car-load of turnips, amounting to 2,080 dozen bunches, to

be transported to certain consignees in Pittsburg, Pa., and on March 27, 1913, delivered to it at the same place another car-load of turnips, amounting to 2,013 dozen bunches, to be transported to certain consignees in Chicago,. Illinois; that the turnips ·were loaded in refrigerator cars and were to be fully iced,—that is, to be iced and reiced,—so as to preserve their contents; that the railroad company consumed 9 days in transporting each of these cars to destination, whereas 72 hours would have been a reasonable time for such transportation, and failed to keep the cars properly refrigerated; so that, by reason of the delay and the failure to keep the car properly refrigerated, the turnips were worthless when they reached their destination, were refused by the consignees, and became a total loss to the plaintiffs; that the reasonable market value of these turnips in Pittsburg and Chicago at the time when they should have been delivered by the carrier was 45 cents per dozen bunches, or a total of $936 for the Pittsburg shipment, and $905.85 for the Chicago shipment; that all the turnips were the property of the plaintiffs, and were shipped to be sold for their account by the consignees, and were fresh vegetables at the time of shipment; and therefore that the plaintiffs were injured and damaged by the defendant in the sum of $1,841.85, for which they· prayed judgment.

The defendant demurred generally, and also demurred because no copy of the bill of lading and contract of shipment was attached to the petition, though the petition indirectly suggested a contract for icing the vegetables shipped; and further because it was not stated how the value at destination was arrived at, or whether the amount alleged was the net value after deducting charges for transportation, icing, or selling, or was the gross value of the turnips, or how and in what respect and to what extent and at what point along the line of transportation the defendant failed to ice the cars sufficiently. The plaintiffs thereupon amended the petition by alleging that the railroad company's local agent at Thomasville orally undertook and agreed to keep the cars fully iced, according to custom, as often as necessary to preserve the contents thereof, and received at the same time from the plaintiffs $260 as freight charges on each car. The court then overruled the demurrer, and error is assigned thereon.

We think the court properly overruled the demurrer, since the

amendment made by the plaintiffs covered the one material point raised thereby, and the failure to state whether the value per car alleged was gross or net did not render the petition subject to demurrer. In the absence of anything to the contrary, the allegation would be construed to mean the *net* value of the commodity at destination, and it would remain for the evidence on the trial to develop what was the fact as to this. In view of the allegation in the amendment, however, to the effect that freight amounting to $260 per car was paid to the agent of the railroad company at Thomasville, and construing the petition altogether, it is clear that as amended the petition charged that the value of the turnips was 45 cents per dozen bunches at destination, less the freight. To sum the matter up, it appears that the petition was sufficiently definite to withstand the special demurrers interposed.

Various grounds were urged in the motion for a new trial. Under the special contract of shipment in this case the amount to be recovered in case of loss was the value of the property at the place and time of shipment, and the plaintiff in error insists that there was absolutely no testimony to show what this value was, since the testimony as to value related merely to the market value in Pittsburg and Chicago. If, however, from the market value of the turnips at Chicago and Pittsburg at the time of the shipment, as shown by the testimony, the freight to each point, added to the entire cost of converting the turnips into cash, be deducted, the resulting balance would show the value of the turnips at the point from which shipment was made. Certum est quod certum reddi potest. The evidence establishes the value set out in the petition to have been the gross value of each car, and the documentary evidence shows that the freight on the Pittsburg car was $260.40, and the freight on the Chicago car $285.60; and if these amounts be deducted from the gross market value, a net sum of $675.60 for the Pittsburg car and $620.25 for the Chicago car would result. The court in rendering judgment deducted the further sum of 10 per cent. from the gross value of each shipment, or $93.60 from the Pittsburg shipment and $90.58 from the Chicago shipment, to cover commission charges for handling, which would have accrued had the goods arrived and been handled in due course. There appears to be no direct testimony authorizing this deduction for commission charges, except the following "note" at the close of the entire

evidence: "This car diverted from Minneapolis, Minn., to Chicago by shipper's order. See other evidence. Freight $285.60. Commission charges for handling, ten per cent." So that in deducting ten per cent. commission charges from the Pittsburg car on account of this testimony, showing that such a deduction was proper on the *Chicago* shipment, the defendant really received a benefit which was doubtless equitable (since probably the Pittsburg shipment would have been subject to a similar charge), but which was not *required* by the evidence; for, so far as appears therefrom, the consignees in Pittsburg may have expected to handle that shipment for the plaintiffs without any cost whatsoever for placing it on the market. The defendant evidently has no cause of complaint here, and it may be fairly concluded that the value of the turnips at the point of shipment was sufficiently shown.

It was insisted that there was no evidence of negligence on the part of the defendant carrier or its connecting lines, and that, since this was an interstate shipment and (according to its contention) no presumption of negligence is created by any act of Congress, there could be no recovery without such proof. There was abundant evidence showing that the turnips were unreasonably delayed and reached their destination several days after they should have arrived. This in itself was sufficient to authorize the conclusion that the carrier had been negligent, unless some legal excuse for the delay was shown.

The further contention, that the judgment was contrary to the evidence to the effect that shipping turnips wet would bring about the defects complained of, it is unnecessary to discuss, since there was some evidence tending to show that the manner in which the turnips were actually packed was the best possible method; and the judge, sitting as a jury, had the right to accept whichever testimony commended itself to him.

To the contention that the evidence in behalf of the defendant showed, without conflict, that the cars were properly iced, and were kept in that condition from the time they were loaded until they were delivered, and to the main defense interposed by the carrier, that the delay was due to an unprecedented flood, which blockaded the usual railroad routes over which these shipments ordinarily traveled, making such routes impassable, and consequently crowding the lines of railroad over which the cars were

compelled to move, so as to make it impossible for freight to move faster than these cars had moved, and that under the circumstances the movement was made with reasonable dispatch, it may be replied that the evidence, coming entirely from the witnesses for the defendant, was conflicting and uncertain and indefinite to an extent that would reasonably have authorized the trial judge (sitting without a jury) to find that the flood relied upon as an act of God to excuse the carrier for delay was not the sole cause of the delay which actually took place, and which caused the injury to the shipments notwithstanding sufficient icing of the cars. "In order for a carrier or other bailee to avail himself of the act of God . . as an excuse, he must establish not only that the act of God . . ultimately occasioned the loss, but that his own negligence did not contribute thereto." Civil Code, § 2713. The general authorities on this subject are in accord with the rule thus stated. In 1 Moore on Carriers, 308, it is said: "To excuse the carrier the act of God, or vis divina, must be the sole and immediate cause of the injury." In order to exempt a common carrier from liability for loss or injury to goods received for transportation, it must be shown that no act or neglect of the carrier caused or contributed to the loss or injury. If, in consequence of departure from the carrier's line of duty, the goods be lost or injured by the act of God, the carrier is not excused. Id. 308. "A flood which no human power could stay and no prudence or foresight anticipate, or an extraordinary or unprecedented or overwhelming flood which could not have been reasonably foreseen, is an act of God which will relieve a carrier, who is free from negligence, from liability for damage by the flood to goods in his custody." Id. 310. "Interruption to navigation by frost or ice, the freezing up of canals, rivers, or other means of water transportation, is an act of God which will exonerate the carrier from losses occurring from such causes, where no fault is imputable to the carrier." Id. 314. "Where goods are injured in the possession of a carrier by act of God, the carrier is not liable, unless its negligence concurred in causing the injury." Id. 316. But "an injury can not be said to be the act of God which, under any fair view, can be attributed to the negligence of man." *Richmond &c. R. Co.* v. *White,* 88 Ga. 805-6 (15 S. E. 802); Id. 317. See also *Georgia So. Ry. Co.* v. *Barfield,* 1 Ga. App. 203 (58 S. E. 236); *Central of Georgia Railway Co.* v. *Hall,* 124 Ga. 322 (52

S. E. 679, 4 L. R. A. (N. S.) 898, 110 Am. St. R. 170) ; *Savannah &c. Ry. Co.* v. *Commercial Guano Co.,* 103 *Ga.* 590, 598 (30 S. E. 555). "Under the Carmack amendment (act June 29, 1906, section 7 [34 Stat. 593, c. 3591, U. S. Comp. St. 1913, § 8592] to the interstate-commerce act, section 20 [24 Stat. 386, c. 104]), a carrier is not excused from liability for destruction of goods by flood, unless it shows some activity in protecting them as necessity arises." Moore on Carriers, 317. "Where the negligence of the carrier operates as a contributive element proximate to injury to goods, even though such injury is to some extent caused by the act of God, the carrier is liable as though the negligence was the entire cause of the loss." Id. 322; Gratiot Street Warehouse Co. *v.* Missouri &c. Ry. Co., 124 Mo. App. 545 (102 S. W. 11).

From the foregoing citations it is evident that the act of God must be the proximate cause of the resulting injury, and must be unmixed with negligence on the part of the carrier before it can amount to a complete defense on account of resulting injury or damage to the property, and the same rule must apply where the resulting injury or damage to the property is caused by delay in delivery attributable to the act of God. If the delay be attributable altogether to the act of God, this defense will suffice; but if the delay was partly caused by the act of God and partly by the negligence of the carrier, it then remains to be determined whether the act of God was the *proximate* cause of the damage to the property, unmixed with the negligence of the carrier. If the act of God alone is sufficient to bring about such a necessary delay as must result in damage to the property in course of transit, the defense would be complete; but it is otherwise where the damage to property resulting from delay in transportation arises on account of the act of God combined with the negligence of the carrier.

From the evidence of Mr. Brower, division superintendent of the Atlanta, Birmingham & Atlantic Railroad, it appears that the distance traveled by the car going to Chicago was 1232 miles, including 407 miles from Thomasville to Birmingham, 411 miles from Birmingham to Finley, and 414 from Finley to Chicago, and that it took that particular car 147 hours and 35 minutes to travel this distance; which, as the witness stated, was at the rate of "about 8½ miles an hour." This witness further said: "On my experience as a railroad man, I consider that on a long run *such as this*

*car took* [italics ours], figuring all delays, that a car that averages 10 miles per hour is making reasonable time." The same witness said: "On account of flood conditions, I do not consider this movement unreasonable. Under the conditions, going 10 miles an hour is reasonable time. However, I do not wish to leave the impression that the car described made 10 miles an hour. . . I do not know that the floods interfered with the stuff moving from Memphis. I had no advice that they did." And the witness said that the Pittsburg car traveled 1313 miles, via Richmond, from Thomasville to Pittsburg, in 171 hours and 30 minutes, which would be at the rate of less than 8 miles per hour for the whole time, including delays, etc. From this testimony it appears that, even allowing for the longer routes pursued in consequence of the floods, neither car traveled at what the witness in behalf of the railroad testified was "a reasonable rate of speed," allowing for all delays; and hence the court was justified in concluding that the act of God was not the sole proximate cause of the injury, even admitting that the proof was sufficiently full as to the existence of the floods in the Ohio valley and the consequent hindrance to the movement of freights over the routes which ordinarily would have been taken by these cars.

According to the railroad company's agent at Thomasville, the difference in time between the ordinary route to Pittsburg and the route which was actually followed on account of the flood conditions was only "6, 8, or 10 hours;" and when it is recalled that the report of the delivering carrier showed that this car reached Pittsburg at 11 p. m. on April 1, 1913, having been on the road since March 25, whereas under the testimony of Mr. Herbener *he* had moved perishable vegetables from Thomasville to Pittsburg in 38 hours, it might legitimately be concluded that there was unreasonable delay. To recapitulate, one car was loaded in Thomasville on March 25, and reached Pittsburg on April 1, at 11 p. m., or more than 7 days thereafter, or (according to Brower) 171 hours and 30 minutes. The other car was loaded in Thomasville on March 27 and reached Chicago on April 3, also more than 7 days later. The plaintiff testified that ordinarily 72 hours was amply sufficient for either shipment to reach its destination, and even if the outside number of 10 hours be added, which Fleming testified would be required to go via the long route, through Richmond to Pittsburg, the time would be 82 hours, instead of the 171 hours and 30

minutes actually consumed; and if the testimony of Herbener be taken, only 38 hours plus 10 should necessarily have been so consumed. The Chicago shipment reached that point traveling at the rate of 8½ miles per hour (average time including delays, etc.), whereas, according to Brower, 10 miles per hour for *"this"* shipment, under the existing conditions, would have been a reasonable movement; so that the delay of 1½ miles per hour—the difference between 10 and 8½—was unreasonable, even under the testimony for the defendant; and this added delay, caused by the contributing negligence of the carrier, may have caused the destruction of the property. Again, Fleming testified that "the movement over the Seaboard to Pittsburg is approximately the same as the ordinary movement;" and Brower said he did "not know that the floods interfered with the stuff moving from Memphis," and was also unable to say that the flood conditions affected one of the connecting lines which appeared to be in the midst of the flood district. Taking all the evidence in regard to the possible delays caused by the floods in the Ohio valley, it may be said that the testimony as to how *or to what extent* shipments were delayed solely on account of the floods, and as to the congestion of traffic on the railroads not directly effected thereby is at best extremely unsatisfactory and indefinite, and the judge was justified in finding, as he evidently did, that no sufficient proof had been adduced to excuse the carrier on the theory that the delay was caused by the act of God.

Admitting, for the sake of the argument, that the testimony showed with sufficient clearness that an unprecedented flood, which might be classed as an act of God, caused the delay in delivery of these two cars, it does not appear that the flood caused *all* the delay, or even how much thereof could be directly attributed thereto, and, on the contrary, it clearly appears from the evidence in behalf of the defendant that the cars did not move forward at a rate of speed which was reasonable, even under the conditions existing on account of the floods, and the excuse offered was not legal and sufficient, since the consequences arising from the delay could be attributed in part, if not altogether, to the negligence of the carrier, notwithstanding the intervening act of God.

There was sufficient evidence to authorize the recovery by the plaintiffs; and, the assignments of error being without substantial merit, the judgment of the court below is

*Affirmed. Broyles, J., not presiding.*