# D. C. KNAPP v. MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY COMPANY, a Corporation.

(156 N. W. 1019.)

**New trial — after verdict directed — granting of — discretion of court — trial judge — errors — not prejudicial — supreme court — interference.**

1. The granting of a new trial after a verdict has been directed by the court is a matter which is largely within the discretion of the trial judge, and such discretion will not, as a rule, be interfered with, unless no conclusion can be drawn from the evidence except one favorable to the party for whom the verdict was found, and that the errors, if any, which were committed by the trial judge were clearly not prejudicial.

**Railway company — managing agent — cross-examination under the statute — foundation laid — error.**

2. Error was committed by the trial judge in refusing to permit further cross-examination, under chapter 4 of the Laws of 1907, of one who was claimed to be a managing agent of a railway company, on the ground that the court could not see that the plaintiff could show such person to be a managing agent, after such witness had testified that he had been in the employ of the defendant company for twenty-one years, that during such time he had been operator, station agent, train master, live-stock agent, freight-transfer agent, assistant superintendent, and general agent; that at the time of the trial he was general agent of the company and as such general agent had charge of the business of soliciting freight up and down the line of the company, and solicited the freight from the plaintiff during the times covered by the suit, and also that he had taken part in trying to get a settlement for the plaintiff.

**Freight rate — railway — point beyond terminus — tariffs — general agent — ostensible authority.**

3. Where the freight rate from a certain point which lies beyond the terminus of a railway company and across a lake to certain points upon the line of the railway is advertised in the tariffs of the company as being 22 cents per one hundred pounds, such freight being usually transported across the lake on the boats or barges of an independent company to the point of beginning of said railway company, and the rate from such terminal point to the points of

destination being advertised as 17 cents, it is within the ostensible authority of a general agent of such railway company who prior to such time has induced the plaintiff to lease elevators across said lake, telling him that he could have a 22-cent rate from such point, and who prior to such time negotiated with the boat company to the end that proper transportation could be furnished to such point, after the lake has frozen up and it is impossible to transport the grain by said barges or boats and after a 22-cent rate has been given to such plaintiff, to agree with such plaintiff that, if he will haul the grain to the railway station himself for further transportation, the company will pay him 5 cents per bushel for such hauling.

**Railway company — freight rates — grain elevators — terminal points — reasonable compensation — Interstate Commerce Commission.**

4. Where a railway company has a station on the shores of a lake, and across said lake are grain elevators from which it has been the custom of the company to give a rate of 22 cents per hundred pounds to terminal points upon its line within another state, it being the custom to transport the grain across said lake upon the boats of an independent company, and when the railway company has given to the owner of such elevators such 22-cent rate, and agreed to transport the grain from such elevators to the points of destination for the said sum, but later, on account of the freezing of the waters of the lake, it becomes impossible to operate the boats, it is not a violation of § 6 of the interstate commerce act of June 29, 1906 (34 Stat. at L. 587, chap. 3591, Comp. Stat. 1913, § 8597), which prohibits unlawful discrimination, for such railway company to agree with the shipper that if he himself will haul the grain across the lake to the station of the company it will pay to such shipper 5 cents a bushel for such hauling, provided that such rate is not an unreasonable compensation for such hauling and the court will not hold such allowance of 5 cents per bushel to be unreasonable, in the absence of proof or of a ruling of the Interstate Commerce Commission to that effect.

Opinion filed February 23, 1916.

Action to recover on a contract for hauling freight, *Buttz,* J. Appeal from the District Court of Burke County from an order setting aside a judgment and granting a new trial after a verdict had been directed for the defendant. Defendant appeals.

Order granting new trial affirmed.

Statement by BRUCE, J.

This action was brought to recover $481.83 and interest claimed to be due under a contract by which the defendant agreed to pay the, plaintiff 5 cents a bushel for hauling wheat from Boscurvis, Saskatche-

wan, Canada, and Paisley and Newport, North Dakota, to the depot or shipping tracks of the defendant railway company at Kenmare, North Dakota. Kenmare was the starting point of the railway company, and Boscurvis, Paisley, and Newport were situated some distance north of that point on the Des Lacs lake. It is admitted that 8,836 bushels of wheat were hauled by the plaintiff and delivered to the railway company for shipment, and that the wheat was shipped over the defendant's road from Kenmare to points in Minnesota, and that therefore the contract of shipping was an interstate contract. At the close of the taking of testimony a motion was made ·by the defendant for a directed verdict on the ground that there was no evidence showing the authority of one Cole to make the contract in question, and upon the further ground that the contract, if made, would be a violation of the interstate commerce law, which would subject both the plaintiff and the defendant to prosecution. The court granted the motion and directed a verdict for the defendant, and thereupon judgment was entered in favor of the defendant dismissing the action.

Thereafter the plaintiff made a motion for a new trial upon the following grounds: (1) That the court erred in sustaining defendant's objection to the examination of the witness, W. A. Cole, general agent for the defendant, on his cross-examination; (2) that the court erred in advising and directing the jury to return a verdict in said action in favor of the defendant and against the plaintiff; (3) that the court erred in sustaining defendant's objection to different questions propounded by the plaintiff to witnesses through the trial; (4) that the court erred in overruling the plaintiff's objections to different and divers questions propounded by the defendant. This motion for a new trial was granted, and this appeal is taken from the order granting the same.

*Palda, Aaker, & Greene (Alfred H. Bright* and *John L. Erdall,* of counsel), for appellant.

The agreed freight rate from Kenmare to Minnesota points was 17 cents per 100 pounds. The rate from the lake points was 22 cents per 100 pounds. The alleged contract with the plaintiff for an allowance of 5 cents per bushel for hauling from the lake points to Kenmare amounts to a rebate of 2 cents per 100 pounds, from the established schedule of tariffs, and is in violation of the interstate commerce act as

amended.    34 Stat. at L. 587, chap. 3591, Comp. Stat. 1913, § 8597; Fed. Stat. Anno. 1909 Supp. pp. 262, 263; N. D. Codes, §§ 5870, 5874, 5878 and 5922.

George A. Gilmore and F. B. Lambert, for respondent.

A station agent for a railroad company, authorized to sell and collect for passenger tickets, and to receive and deliver freight and to collect for freight shipments, is sufficient of a managing agent within the meaning of the statute, to make service of summons upon him, in a civil action against a railroad company, service upon such corporation. Brown v. Chicago, M. & St. P. R. Co. 12 N. D. 61, 102 Am. St. Rep. 564, 95 N. W. 153, 14 Am. Neg. Rep. 169; Porter v. Chicago & N. W. R. Co. 1 Neb. 14; American Exp. Co. v. Johnson, 17 Ohio St. 641; Foster v. Charles Betcher Lumber Co. 5 S. D. 57, 23 L.R.A. 490, 99 Am. St. Rep. 859, 58 N. W. 9.

"Managing agent" should be construed to include an agent of a railroad company described as its "general passenger agent, etc." Tuchband v. Chicago & A. R. Co. 115 N. Y. 437, 22 N. E. 360; Palmer v. Chicago Herald Co. 70 Fed. 888; Palmer v. Pennsylvania, 35 Hun, 369; Klopp v. Creston City Guarantee Waterworks Co. 34 Neb. 808, 33 Am. St. Rep. 666, 52 N. W. 819; Blanc v. Paymaster Min. Co. 95 Cal. 524, 29 Am. St. Rep. 157, 30 Pac. 765; Hampson v. Weare, 4 Iowa, 13, 66 Am. Dec. 121.

Such agent may, therefore, be called by the adverse party for cross-examination under the statute, and the corporation is bound by his testimony.    Comp. Laws 1913, §§ 7863, 7870.

In order to urge the illegality of a contract when such illegality does not appear either upon its face or in the plaintiff's evidence necessary to prove the same, the defendant must specifically allege such illegality. Neither of these conditions appeared in this case, and hence it was error to direct a verdict on such ground.    Frankel v. Hillier, 16 N. D. 387, 113 N. W. 1067, 15 Ann. Cas. 265.

Where a party claims a privilege under a statute, it is necessary to plead and prove that the party comes under such statute.    Bullard v. Northern P. R. Co. 10 Mont. 168, 11 L.R.A. 246, 3 Inters. Com. Rep. 536, 25 Pac. 120.

Agency is a question of fact.   Corey v. Hunter, 10 N. D. 5, 84 N. W. 570.

Whether the relation of principal and agent exists is a question of fact for the jury.   2 Thomp. Trials, 2d ed. §§ 1368, 1377; Reid v. Kellogg, 8 S. D. 596, 67 N. W. 687.

A principal cannot take the benefits and repudiate an unauthorized agency.   Wyckoff v. Johnson, 2 S. D. 91, 48 N. W. 837; Union Trust Co. v. Phillips, 7 S. D. 225, 63 N. W. 903.

Ratification of part of an individual transaction is a ratification of the whole.   Comp. Laws 1913, § 5764.

The freight charge here questioned was just and reasonable, and this is all the law demands.   Fed. Stat. Anno. 1909 Supp. p. 266, 34 Stat. at L. 589, chap. 3591.

But no one shall be given an undue preference.   Cincinnati, N. O. & T. P. R. Co. v. Interstate Commerce Commission, 162 U. S. 184, 40 L. ed. 935, 5 Inters. Com. Rep. 391, 16 Sup. Ct. Rep. 700; Interstate Commerce Commission v. Baltimore & O. R. Co. 145 U. S. 263, 36 L. ed. 699, 4 Inters. Com. Rep. 92, 12 Sup. Ct. Rep. 844.

The defense of *ultra vires* cannot be raised unless the act is directly prohibited by law, and especially when the corporation has accepted and retained the benefits of its contract.   Tourtelot v. Whithed, 9 N. D. 467, 84 N. W. 8; Hunt v. Northwestern Mortg. Trust Co. 16 S. D. 241, 92 N. W. 23.

In cases of doubt, where relief is sought in the interest of the carrier, the construction will be against the carrier.   Interstate Commerce Commission v. Louisville & N. R. Co. 73 Fed. 409, citing Interstate Commerce Commission v. Baltimore & O. R. Co. 3 Inters. Com. Rep. 192, 43 Fed. 51.

The rate must be not only reasonable, but it must be equal and uniform, taking into consideration the time, kind, and circumstances of the transaction.   The object of the statute is to prevent one shipper from getting the advantage over his competitor in the matter of rates only where they both make substantially a like offering to the carrier. United States v. Hanley, 71 Fed. 673.

The burden of proof rests upon the party alleging the existence of an undue preference or advantage.   Interstate Commerce Commission v.

Baltimore & O. R. Co. 3 Inters. Com. Rep. 192, 43 Fed. 37; Interstate Commerce Commission v. Louisville & N. R. Co. 73 Fed. 409; Denaby Main Colliery Co. v. Manchester, S. & L. R. Co. L. R. 11 App. Cas. 97, 55 L. J. Q. B. N. S. 181, 54 L. T. N. S. 1, 50 J. P. 340, 6 Eng. Ry. & C. Traffic Cas. 133.

The burden of proof is upon the complaining carrier to show a discrimination within the statute. Oregon Short Line & U. N. R. Co. v. Northern P. R. Co. 4 Inters. Com. Rep. 249, 51 Fed. 465; Interstate Commerce Commission v. Louisville & N. R. Co. 73 Fed. 409.

It has been held that, in an action for damages for charging unreasonable rates, the published schedule rate is conclusively taken as a reasonable rate, and if no more is charged, there can be no recovery. Van Patten v. Chicago, M. & St. P. R. Co. 81 Fed. 545; Interstate Commerce Commission v. Alabama Midland R. Co. 168 U. S. 169, 42 L. ed. 423, 18 Sup. Ct. Rep. 45.

Adequate consideration for reduced rates prevents such rates from constituting unjust discrimination. Interstate Commerce Commission v. Baltimore & O. R. Co. 145 U. S. 281, 36 L. ed. 705, 4 Inters. Com. Rep. 92, 12 Sup. Ct. Rep. 844; Interstate Commerce Commission v. Texas & P. R. Co. 4 Inters. Com. Rep. 114, 52 Fed. 187.

A rebate, drawback, or special rate is not of itself unjust discrimination; for it does not necessarily follow that a like rebate, drawback, or special rate has not been extended to all the patrons of the carrier. United States v. Hanley, 71 Fed. 673; United States ex rel. Morris v. Delaware, L. & W. R. Co. 2 Inters. Com. Rep. 617, 40 Fed. 101.

The law does not prohibit all discrimination, but only such as is undue or unreasonable, under the circumstances of the case. Interstate Commerce Commission v. Texas & P. R. Co. supra; Oregon Short Line & U. N. R. Co. v. Northern P. R. Co. 4 Inters. Com. Rep. 249, 51 Fed. 465, 4 Inters. Com. Rep. 718, 9 C. C. A. 409, 15 U. S. App. 479, 61 Fed. 158; Little Rock & M. R. Co. v. St. Louis, I. M. & S. R. Co. 4 Inters. Com. Rep. 537, 59 Fed. 402; Little Rock & M. R. Co. v. St. Louis Southwestern R. Co. 26 L.R.A. 192, 4 Inters. Com. Rep. 854, 11 C. C. A. 417, 27 U. S. App. 380, 63 Fed. 775; Interstate Commerce Commission v. Alabama Midland R. Co. 5 Inters. Com. Rep. 308, 69 Fed. 227; United States ex rel. Coffman v. Norfolk & W. R.

Co. 109 Fed. 836; Interstate Commerce Commission v. Alabama Midland R. Co. 168 U. S. 170, 42 L. ed. 424, 18 Sup. Ct. Rep. 45, (C. C. A.) 5 Inters. Com. Rep. 685, 21 C. C. A. 51, 41 U. S. App. 453, 74 Fed. 715; Denaby Main Colliery Co. v. Manchester, S. & L. R. Co. (1880) 3 Eng. Ry. & C. Traffic Cas. 426; Phipps v. London & N. W. R. Co. [1892] 2 Q. B. 229, 61 L. J. Q. B. N. S. 379, 66 L. T. N. S. 721, 8 Eng. Ry. & C. Traffic Cas. 83; Cincinnati, N. O. & T. P. R. Co. v. Interstate Commerce Commission, 162 U. S. 184, 40 L. ed. 935, 5 Inters. Com. Rep. 391, 16 Sup. Ct. Rep. 700; Texas & P. R. Co. v. Interstate Commerce Commission, 162 U. S. 197, 40 L. ed. 940, 5 Inters. Com. Rep. 405, 16 Sup. Ct. Rep. 666; Palmer v. London & S. W. R. Co. L. R. 1 C. P. 593, 35 L. J. C. P. N. S. 289, 12 Jur. N. S. 926, 15 L. T. N. S. 159, 15 Week. Rep. 11; Interstate Commerce Commission v. Louisville & N. R. Co. 73 Fed. 409; United States v. Tozer, 39 Fed. 369.

A carrier may protect itself against physical disadvantages. Detroit, G. H. & M. R. Co. v. Interstate Commerce Commission, 21 C. C. A. 103, 43 U. S. App. 308, 74 Fed. 832, affirmed on other points in 167 U. S. 644, 42 L. ed. 309, 17 Sup. Ct. Rep. 986; Interstate Commerce Commission v. Chicago G. W. R. Co. 209 U. S. 108, 52 L. ed. 705, 28 Sup. Ct. Rep. 493.

There is no power vested to declare an established or proposed rate unreasonable, or enjoin its enforcement prior to the decision of the Commission. Potlatch Lumber Co. v. Spokane Falls & N. R. Co. 157 Fed. 588; Great Northern R. Co. v. Kalispell Lumber Co. 91 C. C. A. 63, 165 Fed. 25; Atlantic Coast Line R. Co. v. Macon Grocery Co. 92 C. C. A. 114, 166 Fed. 206; Meeker v. Lehigh Valley R. Co. 162 Fed. 354; Southern R. Co. v. Tift, 206 U. S. 428, 51 L. ed. 1124, 27 Sup. Ct. Rep. 709, 11 Ann. Cas. 846.

The Interstate Commerce Commission has exclusive jurisdiction as to the reasonableness of rates or charges. Columbus Iron & S. Co. v. Kanawha & M. R. Co. 171 Fed. 713; Houston Coal & Coke Co. v. Norfolk & W. R. Co. 171 Fed. 723, 101 C. C. A. 626, 178 Fed. 266; Langdon v. Pennsylvania R. Co. 194 Fed. 486; L. Starks Co. v. Grand Rapids & I. R. Co. 165 Mich. 642, 131 N. W. 143; Texas & P. R. Co. v. Abilene Cotton Oil Co. 204 U. S. 426, 51 L. ed. 553, 27 Sup. Ct. Rep. 350, 9 Ann. Cas. 1075; Meeker v. Lehigh Valley R. Co. 162 Fed.

354; Interstate Commerce Commission v. Diffenbaugh, 222 U. S. 42, 56 L. ed. 83, 32 Sup. Ct. Rep. 22; Union P. R. Co. v. Updike Grain Co. 222 U. S. 215, 56 L. ed. 171, 32 Sup. Ct. Rep. 39; Mitchell Coal & Coke Co. v. Pennsylvania R. Co. 230 U. S. 247, 57 L. ed. 1472, 33 Sup. Ct. Rep. 916.

BRUCE, J. (after stating the facts as above). We have repeatedly held that the granting of a new trial for insufficiency of the evidence to support a verdict is within the trial court's discretion unless no conclusion can be drawn from the evidence except one favorable to the party for whom the verdict was found. Malmstad v. McHenry Teleph. Co. 29 N. D. 21, 149 N. W. 690. The same rule should, of course, apply where the trial court has directed a verdict and later sets it aside believing that he erred in his decision.

The first point urged by respondent as a justification for the action of the trial judge in granting a new trial is that such judge erred in unduly limiting the cross-examination under the statute of the witness Cole; and that the testimony, even as introduced and without the benefit of the cross-examination, showed the agency of the said Cole for the defendant railway company, and, therefore, that if the trial judge directed the verdict on the assumption that no agency had been proved, and therefore no contract between the said railway company and the said plaintiff, he certainly committed no error in setting aside such order and granting a new trial.

The second point urged is that the trial court erred in his construction of the Interstate Commerce act of June 29, 1906, and that if he directed the verdict on account of the provisions of such act no error was committed in reversing the order and granting a new trial. The judge's memorandum granting a new trial makes clear his position in the case. It is as follows:

## Judge's Memorandum.

The order above is made on both of the grounds on which the motion is based, to wit, errors of law occurring at the trial and insufficiency of the evidence to justify a directed verdict, the court's position being that it was necessary to plead and prove the statute relied upon to defeat the claim sued upon, and that even though the question of plead-

ing and proof be waived and the interstate commerce act of June 29, 1906, be construed as alleged and proved, still the case comes within that portion of § 15 of said act found on page 266 of the 1909 Supplement of the Federal Statutes Annotated, which reads as follows: 'If the owner of property transported under this act, directly or indirectly, renders any service connected with such transportation or furnishes any instrumentalities used therein, the charge and allowance therefor shall be no more than just and reasonable.' That in construing said act the court holds that it is necessary for the party relying upon such wording of said act to allege and prove that the services connected with such transportation and instrumentalities used therein, furnished by the plaintiff, was unreasonable; that no proof of this kind was offered or received, and that in effect affirmative evidence was offered by the plaintiff in the shape of published schedules of said defendant showing that the charge made by the plaintiff was exactly that charge contained in such schedule as being a portion of the through rate to go to the Lake Barge Company, as their proportionate share of the published tariff and the presumption being that such proportional charge was reasonable. Further, the court's position is that, under the circumstances in the case, the charge made was a reasonable one, and that in all events the question of its reasonableness or unreasonableness should have been submitted to the jury.

We have no doubt that the trial court erred in refusing to allow the further cross-examination under § 7870, Comp. Laws 1913, of the witness Cole, and also in his conclusion, if such conclusion was made, that the agency of Cole for the defendant railway company was not proved. The witness Cole was called for cross-examination under the statute. He testified that at the time of the trial he was in the employ of the Soo Railway Company and had been in such employ for twenty-one years; that during such time he had been operator, station agent, train master, live-stock agent, transfer-freight agent, assistant superintendent, and general agent; that he had been transferred up and down the Soo Railway for twenty years; that at the time of the trial he was *general agent* of the company and as such had general charge of the business up and down the line in soliciting freight; that he had

charge of and solicited freight from the plaintiff in the fall of 1910 and 1911 and from points up the Des Lacs lake; that he did nothing except to suggest or something of that kind; that as a general agent he had to frequently give suggestions along that line, and that he never, after suggesting to a man, told him that he had not anything to do with it; that in the case of the particular claim he negotiated with Mr. Knapp to try to get the best settlement he could for him. Counsel for defendant objected to any further cross-examination under the statute, as there was no foundation laid. Counsel for plaintiff said: "If you will turn to chapter 4 of the 1907 Session Laws you will find the following: 'A party to the record of any civil action or proceeding, or a person for whose immediate benefit such action or proceeding is prosecuted or defended, or the directors, officers, superintendent or managing agents of any corporation, which is a party to the record in such action or proceeding may be examined upon the trial thereof as if under cross-examination at the instance of the adverse party or parties, or any of them, and for that purpose may be compelled in the same manner and subject to the rules as any other witness to testify, but the party calling for such examination shall not be concluded thereby, but may rebut it by counter testimony.' " The court said: "I can't see that you can show Mr. Cole as managing agent. Sustain the objection."

It is clear to us that the learned trial judge erred in the matter. If he erred, and the error and consequent curtailment of the right of cross-examination under the statute was at all prejudicial to the plaintiff's case, he had, of course, the right to consider the fact when exercising his discretion on the motion for a new trial.

It is clear to us, indeed, that the fact that the witness Cole was a managing agent of the defendant company had been sufficiently established, and, such being the case, that the plaintiff was entitled to freely cross-examine him as an adverse party, and under the latitude of examination which is allowed by § 7870, Comp. Laws 1913, § 7352, Rev. Codes 1905, Comp. Laws 1913, § 7972, chap. 4, Laws of 1907.

Not only did the testimony of the witness himself tend to show this managing agency, but, prior to this examination, the following exhibit had been introduced in evidence:

The Minneapolis, St. Paul, & Sault Ste. Marie Railway Company. Minneapolis, June 6, 1910. Effective June 10th, Mr. W. A. Cole is appointed general agent with office at Minot, N. D. T. E. Sands, General Freight Agent. Approved: W. L. Martin, Vice President & Traffic Manager.

This notice, it will be observed, was signed both by the general freight agent and by the vice president and traffic manager. The railroad agent at Minot testified that he had received a similar notice, had received it from the traffic department, and had acted under it. He testified that he had acted under it in his dealings with the witness Cole, and he positively testified that the position held by the witness Cole was that of *"assistant superintendent and general agent."* See also Tuchband v. Chicago & A. R. Co. 115 N. Y. 437, 22 N. E. 360; Brown v. Chicago, M. & St. P. R. Co. 12 N. D. 61, 102 Am. St. Rep. 564, 95 N. W. 153, 14 Am. Neg. Rep. 169; Palmer v. Pennsylvania, 35 Hun, 369; Klopp v. Creston City Guarantee Waterworks Co. 34 Neb. 808, 33 Am. St. Rep. 666, 52 N. W. 819; Blanc v. Paymaster Min. Co. 95 Cal. 524, 29 Am. St. Rep. 157, 30 Pac. 765; Hampson v. Weare, 4 Iowa, 13, 66 Am. Dec. 121.

Under this state of the record, also, there is absolutely no foundation for appellant's contention that the agent Cole did not have either actual or *ostensible* authority for making the contract for the hauling of the grain in question, provided that such a contract was not forbidden by the statutory law, or was not against the public policy, and this latter question we will consider later.

Not only did the evidence before mentioned show the general agency of the said Cole, and this both in the freight and traffic departments of the road, but his previous conduct and dealings and the acquiescence by the company in them, and their subsequent ratification of the contract in question would justify any one in that belief.

The first shipment was made on or about the 27th day of January, 1911. On June 8, 1910, a circular was issued by the defendant railway company in which the appointment of the witness W. A. Cole, as *general agent* with offices at Minot, was announced. The witness Cole specifically testified that, prior to the shipment in question, his

principal business was that of soliciting freight. Prior to the shipment in question he had entered into negotiations with the plaintiff, and had induced him to lease elevators at Boscurvis, Paisley, and Newport, and had assured him that he could get a 22-cent rate from his elevators while the lake was open, and exerted himself in seeing that the boats on the lake were in condition to transport the same to the starting point of the railroad at Kenmare. Later on he took an active part in an attempted settlement of the claim. An agent whose prime function is to solicit freight; who goes by the title of general agent; who induces men to lease elevators in order that his company shall have freight; and who, though controlled by the tariffs of the road which are authorized by the Intersta.c Commerce Commission, nevertheless refers to these tariffs in soliciting trade,—has, in our opinion, after transportation by the usual agencies and by the connecting carrier contemplated has become impossible by the freezing of the waters of the lake, the ostensible authority to agree that, if the shipper will himself haul the grain across the lake on the ice by team, the railway company will pay him a reasonable amount for so doing.

A general agent of a railway company must be presumed to have some powers; and though the witness Cole, at one point in his testimony, states that his only function was to "make suggestions" and "to jolly," his prior transactions with the plaintiff and with the navigation company which plied upon the lake hardly bear out his word.

It is idle, indeed, to contend that the agent, W. A. Cole, did not have at least ostensible authority to make this contract. He was to all intents and purposes, and as far as the public was concerned, the general freight agent, the vice president, and the traffic manager of the road. There is no other way in which to construe his authority if any weight whatever is to be given to the terms of his appointment, and which were contained in a circular to the agents of the company, and which circular was as follows:

The Minneapolis, St. Paul, & Sault Ste. Marie Railway Company. Minneapolis, June 6, 1915. Effective June 10th. Mr. W. A. Cole is appointed general agent with office at Minot, N. D. T. E. Sands, General Freight Agent. Approved: W. L. Martin, Vice President and Traffic Manager.

It is also idle to say that his ostensible authority was only in the freight department, and that a contract for hauling grain belonged to the traffic, and not to the freight side of the road; for his appointment, as far at least as the public and the other agents and servants of the company were concerned, was that of a general agent, and was not merely signed by the general freight agent, but was approved by the vice president and traffic manager of the road.  This circular was issued on June 8, 1910, while the first shipment of grain here under consideration was on the 27th day of January, 1911.

And not only was the contract within the ostensible, if not the actual, authority of the agent Cole, but it was subsequently ratified by the company itself, for it is undisputed that it collected from the consignees the through rate of 22 cents a hundred pounds from the elevators at Boscurvis, Paisley, and Newport when the rate from Kenmare was only 17 cents.  If, indeed, no such contract for hauling was authorized, and the freight was considered as received at Kenmare, and not at the elevator points, why did the agent at Kenmare issue bills of lading from Boscurvis, Paisley, and Newport, and not from Kenmare, and why did the company collect the full 22-cent rate?  And if they did not intend to assume the responsibility for the grain at the elevators, why did they issue, or, at any rate, authorize the issuance of a sole tariff sheet entitled, "Minneapolis, St. Paul, & Sault Ste. Marie Ry. Local and Proportional Tariff on Grain," in which they advertised a 22-cent rate from Boscurvis, Paisley, and Newport, but said nothing concerning the navigation company, save that the charge included cost of elevation from Mitchell Brothers' barges into cars at Smith, North Dakota?  Not only, too, was there a ratification, but there was a prior custom and a prior course of dealing.

All of these facts were shown either by the defendant's own testimony and exhibits, or by the testimony of the plaintiff Knapp, which, as far as this appeal is concerned, must be taken as true.

This brings us to a consideration of the question as to whether the contract to pay the plaintiff 5 cents a bushel for hauling his grain from his elevators at Boscurvis, Paisley, and Newport to the railroad depot at Kenmare, was in violation of § 6 of the interstate commerce act, which forbids rebates and unlawful discriminations.

This really leads us to a determination of the question as to whether the railroad company was paying the plaintiff for services in hauling which they themselves had contracted and were authorized to contract to perform, or whether they were paying him for services and for hauling for which they themselves were not or could not be obligated.

If, indeed, the evidence disclosed or tended to disclose that the defendant railway company, though its line actually began at Kenmare, had the right to contract for the hauling of the grain and to be responsible therefor, not merely from Kenmare, but from the points across the lake at Boscurvis, Paisley, and Newport, even though the carriage across the lake would necessarily have to be actually done by an intermediary and independent carrier, and that the defendant, though not in fact the first carrier, assumed the duties and obligations of such, and was nevertheless the *initial* one, then there is no question that the charge or allowance of 5 cents a bushel for the hauling was justified, provided only that it was reasonable. The case, in short, comes within the exception to § 587 of vol. 34 of the Statutes at Large, chap. 3591, Comp. Stat. 1913, § 8597 (Fed. Stat. Anno. 1909 Supp. pp. 262, 263), which forbids rebates and unlawful discriminations. This exception is contained in 34 Stat. at L. 590, chap. 3591, Comp. Stat. 1913, § 8584, Fed. Stat. Anno. 1909 Supp. 266, and provides that "if the owner of property transported under this act directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be no more than is just and reasonable, and the Commission may, after hearing on a complaint, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the services so rendered or for the use of the instrumentality so furnished, and fix the same by appropriate order, which order shall have the same force and effect and be enforced in like manner as the orders above provided for in this section."

Is there, then, evidence which should have gone to the jury on the question of whether the defendant agreed in the first place to assume the responsibility of an initial carrier toward the grain in the plaintiff's elevators and to keep those elevators empty, but on account of the freezing of the waters of the lake was unable to have the grain carried

on the boats of the navigation company as originally contemplated, and therefore, and in order to live up to its agreement, itself agreed to pay the plaintiff a reasonable rate for hauling the grain across the ice, reserving, however, the right to charge the regular tariff rate from the elevator points to the points of destination. Such a contract would have been perfectly lawful, and we think that there was evidence which tended to show that it had been made.

The plaintiff, Knapp, testified: "Mr. Cole solicited freight from me for the Soo road; in the fall of 1910 and prior to that time and after that time. He solicited freight from me on the Des Lacs lakes. The first talk was at Portal, I believe sometime in October, 1910. It was in regard to renting the elevators on the lake. He told me they were good points, and he asked me to go down and make a trial trip on the boat, look over the situation, and see what I thought about it. There was something said about shipping over the Soo road. He wanted me to go down and look over the situation. I did so. I had a conversation after that with him about points along there. I made the trial trip on the boat, and it didn't look very good to me, and I told him so. I told him that to me it didn't look as if they were very well equipped for hauling grain, but he assured me it was all right. I believe he said we would have no trouble in getting rid of all grain, that they had put $1,000 into the conveyer. *He was representing the Soo road. He said the Soo road expended the money. He said the billing receipts would read from Boscurvis, Newport, and Paisley, and that I would get the receipts at Kenmare. No question about keeping the house empty so I could buy grain. The shipments were to be made over the Soo line.* Mr. Cole, of the Soo road, did something in regard to fixing up the barges. He furnished some ties and some money to fix them up. I am sure the voucher was between forty and fifty dollars. The grain was not kept away from the elevators during the fall so that it would not get full. The elevators were pretty full in so far as grain was concerned when the lake froze up in the fall. I went to Mr. Cole. I went to him in Kenmare, and told him that the lake had frozen up, and I asked him how I could get the grain down. The only way left would be to wait until the ice froze hard enough to haul it down by team. We both said that, so he told me that

33 N. D.—20.

*if I would see to the hauling down he would see that I would be paid
5 cents a bushel for hauling. He said the Soo line would pay me 5
cents a bushel from the points of Paisley, Newport, and Boscurvis.*
I hauled the grain pursuant to this agreement. *I paid the regular 22-
cent rate on what I hauled.* I hauled down 8,598 bushels at that
time. , I hauled them down after I had this agreement that I would
receive 5 cents for hauling. I never got the money for hauling. I
negotiated with Mr. Cole. In the summer of 1911, he said in the
presence of Mr. Gilmore that the voucher was already made out, wait-
ing for Mr. Palda's o. k. I did not pay the freight on the grain
myself. This wheat was consigned to the Brown Grain Company and
they paid the freight on it. I suppose it came out of the wheat in my
settlement with the Brown Grain Company. This defendant hauled it
at the rate of 22 cents a hundred."

In addition to this testimony there are in evidence bills of lading
or receipts of the railway company bearing the heading: "Minneapolis,
St. Paul, Sault Ste. Marie Railway Company," and signed: "M.
St. P. & S. Ste. M. Ry. Co. by John Schmid, Agent," and *acknowl-
edging receipt of the grain at the points of Paisley, Newport, and
Boscurvis,* and containing the following receipt and shipping agree-
ment: "Received, subject to the classifications and tariffs in effect on
the date of issue of this shipping order *at Paisley (Newport or Boscur-
vis, as the case happened to be)* from D. C. Knapp, the property
described below in apparent good order, except as noted (contents and
conditions of contents of packages unknown) marked, consigned, and
destined as indicated below, *which the Minneapolis, St. Paul, & Sault
Ste. Marie Railway Company agrees to carry to its usual place of
delivery at said destination,"* etc. The distinations given in these
receipts are Kingston, Ont., Minneapolis, Minnesota, and Superior,
Wisconsin. In addition to this, there is in the evidence a tariff sheet
of the defendant railway company which bears its name and its name
alone, and purports merely to be issued by it, which names a rate
from the elevator points of Boscurvis, Paisley, and Newport of 22
cents, and which contains the following tariff: "Minnesota Division,
continued; Newport, Paisley, or Patterson, N. D., or Boscurvis, Sask.
to Minneapolis, St. Paul, Camden Place or Duluth, Minn., or Superior,

Wis., 22 cents." There is nothing whatever which refers to any navigation company except a note that the 22 cents "includes the cost of elevation from Mitchell Brothers' barges into the cars ·at Smiths, N. D." The same tariff contains the rate from Kenmare to the same terminals of Minneapolis, St. Paul, Duluth, etc., and gives that rate as 17 cents.

It is absurd to contend in the face of this record that there was no evidence to go to the jury and which tended to show, if it did not conclusively prove, that the railway company had contracted for the transportation of this grain from the elevator points, although it did not actually receive the grain on its cars until it reached Kenmare, and that the defendant was, to all intents and purposes, *the initial carrier* from the elevator points of Boscurvis, Paisley, and Newport. An initial carrier is, according to all authorities, the carrier first contracting with the shipper, and is not necessarily the one whose line constitutes the first link in the chain of transportation. See note in 31 L.R.A. (N.S.) 2; Savannah, F. & W. R. Co. v. Commercial Guano Co. 103 Ga. 590, 30 S. E. 555; Noyes v. Rutland & B. R. Co. 27 Vt. 110; Swift v. Pacific Mail S. S. Co. 106 N. Y. 206, 12 N. E. 583; Evansville & C. R. Co. v. Androscoggin Mills, 22 Wall. 594, 22 L. ed. 724. It is also absurd to contend that there is no evidence which tends to show that it agreed to pay the plaintiff the 5 cents per bushel as compensation for services for the hauling which it itself had agreed to perform.

It is also absurd to contend that the testimony of the plaintiff Knapp (and on the question of the directed verdict and alleged error in granting a new trial on account of such direction, the fact that much of this testimony is denied by the witness Cole is of no importance) does not show that a contract for paying for the hauling was made by the defendants' agent Cole, and that the reason for making the same was that the railway company, through its agent Cole, had induced the plaintiff to lease the elevators on the lake by holding out to it a 22-cent rate from such elevators to the Minnesota terminals, and by promising that it would see that the grain was properly transported across the lake, that it would see that the barges were kept in shape, and that it would bill the grain not from Kenmare, but from

Boscurvis, Paisley, and Newport, the points on the lake where the elevators were situated, and, above all, that it would see that proper shipping facilities should be furnished so that the elevators would be kept empty, and that the plaintiff would be enabled to buy grain with some assurance of safety. It shows that the company did not keep the elevators empty, and that the lake froze up when they were partly or wholly filled; that Cole then agreed, and as we may well infer, in order to meet his promise to keep the·elevators empty, and which promise had induced the plaintiff to lease them and run the risks of his enterprise and of his purchases, that his company would pay the plaintiff a reasonable rate for hauling the grain on the ice; that is, for doing what the railway company, or, what is the same thing, had agreed that its agent, the navigation company, would do.

It is idle to say that the charge or compensation of 5 cents per bushel for hauling the grain on the ice was unreasonable. Not only was the burden of proof upon the defendant to show this fact, but the matter, in the absence, at any rate, of a determination by the Interstate Commerce Commission, was for the jury, and not for the court, to pass upon.

There can be no question that the defendant railway company had the power to enter into such a contract, and to assume the responsibility for the grain, even before it actually reached its own line. "It seems to be now well settled," says the supreme court of Vermont in the case of Noyes v. Rutland & B. R. Co. 27 Vt. 110, "that railroad companies, as common carriers, may make valid contracts to carry beyond the limits of their own road, either by land or water, and thus become liable for the acts and neglects of other carriers, in no sense under their control. Muschamp v. Lancaster & P. Junction R. Co. 8 Mees. & W. 421, 2 Eng. Ry. & C. Cas. 607, 5 Jur. N. S. 656; Weed v. Saratoga & S. R. Co. 19 Wend. 534; Farmers' & M. Bank v. Champlain Transp. Co. 23 Vt. 186, 56 Am. Dec. 68. It has never been questioned that carriers, whether natural or artificial persons, might by usage or contract bind themselves to deliver parcels and merchandise beyond the strict limits of their line in town and country; and in such case could only exonerate themselves by a personal delivery, 23 Vt. 186, and cases there cited. It seems to us, in principle, that these two proposi-

tions control the present case, for if a railroad company may contract for carrying merchandise and parcels beyond the limits of their line, *where the carriage is by porters, stages, by steamboats, or other watercraft,* or by other railroads, and this is to be justified upon the ground of usage and convenience, or common understanding and consent, the same rule of construction must equally extend to contracts to receive freight at points on the line before it reaches the company entering into the contract. It may be true, in one sense, that this is extending the duties and powers of the company beyond the strictest interpretation of the words of their charter. But the time is now past when, as between the company and strangers, any such literal interpretation of the charter is attempted to be adhered to. It is true, that such corporations, even as to strangers, are not allowed to assume obligations altogether beyond the general objects of their incorporation, as if they should assume to build steamboats or other railroads, perhaps. But within the general business of their creation, a very considerable latitude is allowed in contracts with strangers."

In the case of Jordan v. Fall River R. Co. 5 Cush. 69, 51 Am. Dec. 44, the defendants were common carriers of passengers and freight from Boston to Fall river; their trains being drawn from Boston to South Braintree, where the Fall River Railroad commences, by the engines of the Old Colony Railroad Corporation, under the sole direction of the conductors of the latter, and stopping to leave and take passengers on that road. The court held that "the proprietors of a railroad, who receive passengers and commence their carriage at the station of another road, are bound to have a servant there to take charge of baggage, until it is placed in their cars; and if it is the custom of the baggage master of the station, in the absence of such servant, to receive and take charge of baggage in his stead, the proprietors will be responsible for baggage so delivered to him."

In the case of Phillips v. Earle, 8 Pick. 182, "where a package was delivered to the agent of a stagecoach company, at the postoffice, where the stage was standing, and not at the office of the company, to be carried from Boston to Hartford, and was by the agent, when he received it, entered on the waybill, he having previously directed the person who had the care of the package to bring it to the postoffice, and the package

was lost before reaching Hartford, it was held that the owners of the coach were liable to the owner of the package for its value, the delivery at the postoffice being with the assent of their agent."

The case of Swift v. Pacific Mail S. S. Co. 106 N. Y. 206, 12 N. E. 583, is directly in point. The syllabus is as follows: "Defendant, the P. M. S. Co., was organized to navigate steamships on the Pacific and Atlantic Oceans (Laws of 1850, chap. 207). Its line connected at Panama on the Pacific and at Aspinwall on the Atlantic with the road of the defendant, the P. R. R. Co., which was operating under its charter a railroad between those places. In an action upon a joint contract made by the two corporations for the transportation of a quantity of oil from Panama to New York, held that defendants had power to make the contract and were jointly liable for a breach thereof."

It would certainly seem that if a steamship company could, by its bill of lading, contract for and make itself liable for the transportation of goods by railroad across the Isthmus of Panama, and from the western side thereof, when its boats only ran from the eastern side, that a railway company can contract and make itself responsible for the carriage of freight from a point across a lake a few miles distant from its terminus. See also Savannah, F. & W. R. Co. v. Commercial Guano Co. 103 Ga. 590, 30 S. E. 555; Evansville & C. R. Co. v. Androscoggin Mills, 22 Wall. 594, 604, 22 L. ed. 724, 727; Deming v. Merchants' Cotton Press & Storage Co. 90 Tenn. 306, 13 L.R.A. 518, 17 S. W. 89.

Nor can there be any question that the railway company had the right to agree to pay a reasonable amount for the services rendered in hauling the grain.

In the case of Interstate Commerce Commission v. Diffenbaugh, 222 U. S. 42, 56 L. ed. 83, 32 Sup. Ct. Rep. 22, the syllabus is as follows: "The interstate commerce act does not attempt. to equalize fortune, opportunities, or abilities; it contemplates payment of reasonable compensation by carriers for services rendered, and instrumentalities furnished, by owners of property transported, the only power of the Commission being to determine the maximum of such compensation. Contracts made by various railroads for elevation expenses of grain at points of transshipment at rates not exceeding those fixed by the Commission as reasonable, held not to be illegal discriminations or rebates

when paid to owners of elevators on their own grain, although such owners performed services other than those paid for at the same time to their own advantage."

In the case of United States v. Baltimore & O. R. Co. 231 U. S. 274, 58 L. ed. 218, 34 Sup. Ct. Rep. 75, the syllabus is as follows: "The fact that the carrier leases a terminal from a shipper near that shipper's establishments does not, in the absence of any fraudulent intent, import a discrimination in favor of that shipper where the station is actually used for the benefit alike of all shippers in that neighborhood. A carrier may compensate a shipper for services rendered and instrumentalities furnished in connection with its own shipments; and if the amount is reasonable it is not a prohibited rebate or discrimination, even if the carrier does not allow other shippers to render and furnish similar services and instrumentalities and compensate them therefor." See also Union P. R. Co. v. Updike Grain Co. 222 U. S. 215, 56 L. ed. 171, 32 Sup. Ct. Rep. 39; Louisville & N. R. Co. v. United States, 197 Fed. 58; W. H. Ferrell & Co. v. Great Northern R. Co. 119 Minn. 302, 138 N. W. 284.

We have, too, in the case of Mitchell Coal & Coke Co. v. Pennsylvania R. Co. 230 U. S. 247, 57 L. ed. 1472, 33 Sup. Ct. Rep. 916, direct authority for such a contract as was made in the case at bar. In this case an action for damages was brought by a competing mine company for an alleged unlawful preference given to the Altoona, Glen White, Millwood, Latrobe, and Bolivar Mining Companies. The court, in its opinion, said: "The plaintiff insists that these facts demonstrate that the payments to the Altoona and other companies were not measured by the value of the track or locomotive, or by the cost of the service rendered, but were unreasonable in amount, were arbitrarily fixed, lowered, or withdrawn, and constituted a mere cover for rebating. On the other hand, the defendant insisted that, *though bound to haul the cars to and from the mines, it could not economically do the work on account of the physical conditions at the Altoona, Millwood, and Glen White mines,* and that it therefore *employed those companies to perform that transportation service,* paying them therefor an allowance *which is prima facie reasonable,* and must be so treated by the courts until the Commission has determined that it was excessive or constituted an unjust

discrimination. . . . But although the statute then in force was not construed to require the publication of allowances, their payment was lawful only when supported by a consideration. To pay shippers for doing their own work would have been a mere gratuity, and if here the carrier was not bound to haul from the mine, it had no more right to pay these companies for bringing their coal over the spur track to the junction than it would have had to pay a merchant for hauling his goods in a wagon to the railroad depot. The plaintiff insists that such is the case here, and that, as the tariff named the rate from the station, it could not lawfully include the haul from the mine, and consequently paying the shippers for doing their own hauling was a mere rebate. Such undoubtedly it would have been if naming the rate from the station to destination meant that the haul had to begin at the depot building. But neither the statute nor the tariff defines what are station limits, nor do they fix the exact point from which the transportation must begin, nor the territory within which the delivery must be made. These limits necessarily vary with the size of the communities, the extent of the yards, *the practice of the carrier,* and the bounds within which it uniformly receives and delivers freight. This is particularly true in a case like the present, where the Clearfield district was treated as a single shipping point, and where the rate, though named and published as from the station, was universally applied from the mines of the Mitchell company as well as the other companies named in the declaration and all others located in the Clearfield district. Inasmuch as this rate included the haul, the railroad was bound to transport the coal from the mouth of the mines, and could use its own engines for that purpose, or it could employ the coal companies to render that service, paying them proper compensation therefor. In case any question arose as to the reasonableness of the practice, the limits within which the station rates should apply, or the reasonableness of the allowance paid those shippers who supplied motive power, the Commission alone could act. For the courts are no more authorized to determine the reasonableness of an allowance for a haul over a spur track, between mine and station, than they are to pass upon the reasonableness of a rate for a haul, over a trunk line, between station and station. What is or was a proper allowance is not a matter of law until after it has been fixed by the rate regulating body.

The courts can then apply that law, and, measuring what has been charged by what the Commission declares should have been charged, can award damages to the extent of the injuries occasioned by the payment of the allowance found to have been unreasonable and unlawful. That station rates may be.applied from mill or mine reached by spur tracks is recognized by the ruling of the Commission in the Tap Line Case, 23 Inters. Com. Rep. 277, where, in dealing with the practice of paying an allowance for hauling lumber from sawmills, the Commission said: 'In all cases it is apparently the practice of the trunk lines, where no allowance is made, to set the empty car at the mill, and to receive the loaded car at the same point. Indeed, they do this in many cases even when an allowance is made to the tap line. But whenever this service is performed by the trunk line, it is included in the lumber rate, and is done without additional charge. In some instances the switch or spur track connecting the mill with the trunk line is as much as 3 miles long. In other words, by their common practice the public carriers *interpret the lumber rate as applying from mills in this territory apparently as far as 3 miles from their own lines.* So far as the manufactured lumber is concerned, it may therefore be said that where a mill has a physical connection with a trunk line, and is not more than 3 miles distant, *the transportation offered by the trunk line commences at the mill.* If, therefore, a lumber company, having a mill within that distance of a trunk line, undertakes, by arrangement with the trunk line, to use its own power to set the empty car at the mill, and to deliver it when loaded to the trunk line, it is doing for itself what the trunk line, under its tariffs, offers to do under the rate. In such a case the lumber company may therefore fairly be said to furnish a facility of transportation for which it may reasonably be compensated under § 15, whether its tap line is incorporated or unincorporated. In other words, the lumber company thus does for itself what the trunk line does with its own power at other mills without additional charge, and what it must therefore do for the particular lumber company without additional charge. Under such circumstances we think the lumber company, under § 15, may have reasonable compensation when it relieves the trunk line of the duty. But an allowance under such circumstances is lawful only when the trunk line prefers, for reasons of its own and without dis-

crimination, to have the lumber company perform the service. It is not lawful when the lumber company refuses to permit the trunk line to do the work.' Ibid. In view of this ruling it is apparent that lateral allowances might have been lawfully paid. They became unlawful only when unreasonable. Whether they were so or not was a rate-making question as to which parties were directly at issue, and which the courts had no jurisdiction to determine so far as it concerned the allowances to the Altoona, Millwood, and Glen White mines.. Having no jurisdiction, the parties could not by consent give it to the court, to the judge, nor to the referee. And if, as claimed, the stipulation to submit the case to the referee estops the defendant from insisting on the plea of the statute of limitations, that, with all other relevant issues, can then be determined, if the Commission decides that the allowance was unlawful, and the carrier has no other defense."

"All special contracts or traffic arrangements between carrier and shipper," says Mr. Hutchinson in § 538 of the 3d ed. of his work on Carriers, "are not forbidden or condemned, but only such as operate unfairly and evidence undue favoritism toward one, or deprive another of his just rights. So long, therefore, as there is no unjust discrimination and no stipulation in the contract forbidding the carrier extending similar rates to all other shippers similarly situated, there is no express provision of law and no sound reason arising out of public policy which prohibits a carrier entering into a fair and equitable milling in transit arrangement by which the carrier contracts to credit on the freight charges on manufactured goods any freight on raw material shipped to the factory. Nor is a railroad company guilty of unlawful discrimination by receiving cotton from one shipper at a particular place of shipment, shipping it to another point, and having it compressed there at the company's expense, and then reshipped to its place of destination for a rate equal to its published through rate from the place of shipment to such places of destination, where such an arrangement is in compliance with a recognized custom, of which all other shippers can avail themselves, and where it does not appear that a party complaining desires to ship any cotton from that particular place of shipment to the points of destination, or that he is compelled to pay a higher rate under similar

circumstances." Thompson v. San Antonio & A. P. R. Co. 11 Tex. Civ. App. 145, 32 S. W. 417.

These cases are conclusive of the one at bar. There can be no question that the defendant railway company was in the habit of assuming the responsibility for the freight at the elevators of the plaintiff upon the lake, and which, though beyond the line of the railroad itself, were connected therewith by a line of boats, and that the railway company gave to the plaintiff a through rate from the elevators to the points of destination. The elevators, therefore, were in what the case just cited would term the "yard limits" of the railway company. The railway company had agreed to transport or to be responsible for the transportation of the goods from the elevators. The freezing of the waters of the lake had made it impossible to operate, or to see that others would operate, the boats, and the company thereupon agreed with the plaintiff that if he would himself haul the wheat upon the ice it would pay him for such hauling. The case is in no way different from the hauling of ore from the mouth of a mine on a spur track by the mine owner to the railway station, and for which hauling the railway company has agreed to pay. It is not necessary for us to determine whether the company can now question the reasonableness of this charge, or whether it is not a matter for the Interstate Commerce Commission to determine. All we have to say is that there is no evidence which shows it to be unreasonable, and that there is no finding of the Interstate Commerce Commission to that effect.

All that the company could charge from Kenmare was 17 cents. For some reason or other best known to itself, it charged him the rate of 22 cents, which would have been the rate from his elevators, and which would be the correct rate provided that it had agreed to be responsible for the grain from such elevators, or had actually carried it or had caused it to be carried from them. It, however, agreed that if the plaintiff would himself haul the grain from his elevators to Kenmare, it would allow him the 5 cents a bushel for hauling.

We must not assume in this case a criminal intent on the part of the agent Cole or of the railway company, but if they intended to charge the 22 cents from Kenmare, their act was certainly criminal. The plaintiff relies in this case upon the contract. The defendant agreed

to pay him 5 cents a bushel for hauling the grain. If such contract had not been made, he certainly could have brought an action against the company on the ground of an overcharge and for money had and received to the amount of 5 cents per hundred pounds. If such an action had been brought, the company would hardly have cared to defend on the ground that the 22-cent charge was illegal and the contract a nullity. Would anyone contend that if the general freight soliciting agent of an express company were to go to a shipper, and show him a fixed schedule of rates, and tell him that his company was short of teams, and that if he would haul the goods to the depot it would pay him for such hauling and that he could deduct the amount from their charges, that such a contract would be illegal, provided that the amount agreed to be paid for the hauling was reasonable? Such contracts, indeed, appear to be expressly authorized by the interstate commerce act itself, which, among other things, provides that "if the owner of property transported under this act directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be no more than is just and reasonable, and the Commission may, after hearing on a complaint, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the service so rendered or for the use of the instrumentality so furnished, and fix the same by appropriate order, which order shall have the same force and effect and be enforced in like manner as the orders above provided for in this section." See Fed. Stat. Anno. 1909 Supp. 266; 34 Stat. at L. 590, chap. 3591, Comp. Stat. 1913, § 8583.

We realize, of course, that an express company assumes the obligation of transporting the goods to and from homes or places of business of the shippers and consignees, and that express company cases are not always in point nor apply to railway company contracts. As we have before seen, however, a railway company may contract to be liable from a point beyond its lines. It may contract that it itself shall be responsible for the carriage upon an independent line of carriers which connects it with the shipper. It may, in short, make the independent line its agent. The evidence before us shows to us quite conclusively that this was the fact in the case at bar.

The defendant calls attention to another so-called joint tariff on

grain, and, though on his oral argument he contended that this tariff was a mistake and as a matter of fact could not have been promulgated, contends in his printed brief that such document superseded the sole tariff sheet which was issued by the defendant company on the 23d day of December, 1909, and that this later tariff provided for a payment of 5 cents a *bushel* to the navigation company and the balance to the defendant railway company. Even if this be true, however, we do not see how it affects the case before us. Even if it was intended as a tariff for the public generally, and not merely as a memorandum of an agreement between the railway company and the navigation company, it is not at all inconsistent with the through rate from the elevator points, and did not preclude the railway company from making such, provided there was no discrimination as to other shippers. So, too, at the time of the shipment in question, the boats were not running and there was, to all intents and purposes, no navigation company at all. The railroad, therefore, had, if it desired to obtain the grain at all and to live up to its prior promise to the plaintiff on the strength of which he had leased the elevators, namely, to see that he had a 22-cent rate from his elevators and that such elevators should be kept empty, no other option but to return to its tariff of December 23, 1909, or to make some new agreement. All this tariff tends to show, indeed, was that the allowance of 5 cents per bushel as opposed to 5 cents a hundred pounds was a reasonable compensation, for this is exactly the compensation which the additional tariff allows to the first carrier, the navigation company.

In addition to this, there is no question that the trial judge was correct in the statement which he made in granting the motion for a new trial, and as one of the reasons therefor, that the defense of illegality or violation of public policy must be specially pleaded if the court does not refuse to entertain the case. Illstad v. Anderson, 2 N. D. 167, 49 N. W. 659; Atchison & N. R. Co. v. Miller, 16 Neb. 661, 21 N. W. 451; Cardoze v. Swift, 113 Mass. 250.

The order granting a new trial is affirmed.

Goss, J. (concurring). In my opinion the cross-examination was unduly curtailed, as held in the main opinion, and there was evidence sufficient to take the case to the jury for a finding, upon the authority

of Cole, to bind the company by the alleged agreement plaintiff claims to have entered into with defendant, through its agent.

There seems to me to be no question involved of an unlawful preference. Concededly the grain was billed as upon the legal transportation over a connecting carrier from Boscurvis, Canada, to Duluth, and a rate of 22 cents per hundred pounds collected. This rate is in evidence, and had previously been filed with and approved by the Interstate Commerce Commission, thereby validating not only the rate, but the route and the charge made upon that basis. The rate charged and collected was legal and upon a legal contract of carriage. Hence it was within the power of the carrier to allow any owner of property transported who "directly or indirectly renders any service connected with such transportation or furnishes any instrumentality used therein, the charge and allowance therefor (that) shall be no more than is just and reasonable." The word in parenthesis the writer has inserted that the language of the statute may be used. But was this hauling on the ice, doing the transporting originally done by the connecting water carrier, a service to defendant carrier "connected with such transportation," or "any instrumentality used therein" furnished by the shipper. The company has so treated it in billing the shipment and collecting the combined rate therefor. If the carrier could legally thus bill the freight as from the lake point to Duluth, and thereby treat its transportation by plaintiff from the lake points to Smith's Landing as an independent carrier, it could make such contract and treat such transportation as service rendered to it in the transportation of goods from Boscurvis to Duluth. If it could route and charge 22 cents per hundred weight as upon a legal contract of carriage by it from Boscurvis to Duluth under these circumstances where the plaintiff delivered the goods at a point from which the transportation was but 17 cents to Duluth, it certainly could make this contract and agree that the plaintiff by what he had done had rendered "service connected with such transportation," as service to the carrier. If the defendant can legally charge and collect the 22-cent rate as for a contract of carriage, it can agree that a service has been rendered to it by what has been done by plaintiff along that very route. If in law the grain was delivered at Smith's Landing, instead of at Boscurvis, there was no authority for the collection of more than 17 cents per hundred weight. If

on the basis of there being an established and approved 22-cent rate between said points, the company could agree that they have carried the grain between said points, and thereby recognize, under circumstances peculiar to this case, plaintiff to be its connecting carrier for a portion of the way, it could, as plaintiff claims it has, agree also that, in addition to its being such connecting transporting carrier for that portion of the route, plaintiff has also in addition thereto rendered it actual and unusual service, for which it should pay, and for which by contract it has agreed to pay, an added two thirds of the freight rate aggregating 5 cents a bushel all told. In the absence of pleading and proof that the amount agreed to be paid for such service is unjust and unreasonable, it must be presumed that the contract is a reasonable one, and the contract covering both rate and service just and enforceable.

In any event, under the facts peculiar to this case there is a sufficient basis, so that the charge cannot be said to have been agreed to be paid without color of right to contract therefor, and the question then must be one of fact. State ex rel. Railroad Commission v. Adams Exp. Co. 171 Ind. 138, 19 L.R.A.(N.S.) 93, 85 N. E. 337, 966; Gamble-Robinson Commission Co. v. Chicago & N. W. R. Co. 94 C. C. A. 217, and note thereto citing much authority (21 L.R.A.(N.S.) 982, 168 Fed. 161, 16 Ann. Cas. 613). It cannot be held as a matter of law that there was any intent either to give or receive a rebate or commit illegal acts. Without any pleading raising it, and without any proof of intent upon that issue, it should not be held that the parties have contracted for a preference rate simply because the carrier contracted to pay plaintiff 5 cents per bushel out of the rate of 22 cents per hundred collected upon the basis of the established rate from Boscurvis to Duluth.

The trial court was right in granting a new trial.

CHRISTIANSON, J. (concurring specially). While I concur in an affirmance of the order granting a new trial, it seems to me that some of the questions discussed by my brethren Bruce and Goss do not require consideration on this appeal, and I do not care to express any opinion thereon.

It is undisputed that the Des Lacs Navigation Company during the fall of 1910 owned and operated a barge line from certain points on

Des Lacs lake to Smith's (Landing), from which latter point the de-
fendant had constructed a spur track connecting with its main line at
Kenmare, North Dakota. It is also undisputed that the published
tariffs gave a rate of 22 cents per hundred from the lake points, and 17
cents per hundred from Smith's and Kenmare, to Minneapolis, Duluth,
or Superior respectively. It is also undisputed that the Des Lacs
Navigation Company did not succeed in carrying all the grain in the
elevators at the lake points. Plaintiff testified that, after the lake froze
over, defendant's general agent entered into an agreement with him
whereby plaintiff agreed to haul the grain remaining in the elevators
on sleighs over the route formerly used by the navigation company,
for which hauling plaintiff was to receive 5 cents per bushel. Defend-
ant's general agent admits some negotiations with plaintiff with respect
to transportation of the grain over the ice, but denies that he agreed
to pay 5 cents per bushel, and says that in such conversation he "re-
ferred to the tariff schedules." It is conceded that plaintiff hauled in
all 8,836 bushels, 40 pounds, of wheat, and that defendant waybilled
such shipments from the lake points, and at the destination collected
freight charges from such lake points. At the time the agreement was
made, the Des Lacs Navigation Company could no longer operate. It
was to defendant's interest to obtain freight shipments, and it was
only natural to arrange, if possible, with or for some other carrier to
perform the service which the former connecting carrier no longer could
perform. An agency may be created and authority conferred upon an
agent not only by a precedent authorization, but also by subsequent
ratification. (Comp. Laws, § 6328.) And ratification of part of an
indivisible transaction is a ratification of the whole. (Comp. Laws, §
6332.) The arrangement to haul the grain was made by defendant's
general agent. Plaintiff performed the service agreed upon. Defend-
ant accepted the benefits of the agreement. It received and billed the
shipments and collected the joint through freight charges thus earned,
and has retained the whole thereof. Even defendant's counsel admit
that the railroad company has collected and retained in its possession
moneys for freight charges on the shipments in question in excess of
those which defendant has earned at the rate of 5 cents per cwt., or
about $247.40 in all, and that these moneys belong to the plaintiff.
These charges were collected between January 1, 1911, and March 1,

1911. The present action was not commenced until October, 1912, but the excess charges were never returned or offered to plaintiff. Defendant at no time repudiated, in whole or in part, the authority of its general agent to make the traffic arrangement with plaintiff to carry the shipments left by its former connecting carrier, but retained all the benefits received from such arrangement, including the excess freight charges. Under these facts I do not believe that it can be said as a matter of law that the general agent had no authority to make such arrangement, and that the same is not binding upon the defendant.

Did the agreement violate the Federal interstate commerce law by allowing plaintiff a rebate? It seems to me that under the evidence in this case the question of rebating does not arise. The defendant's general agent was called as a witness and testified upon the trial, and, as part of his examination, defendant's counsel offered in evidence a joint tariff schedule showing the distribution of the freight charges between the barge line and the defendant railway company on shipments of grain, flax, and millet seed from the lake points to Minneapolis, Duluth, or Superior, and such joint tariff schedule recites *that the barge line is to receive 5 cents per bushel* and the Soo line the balance. The joint tariff schedule so offered in evidence is signed by T. E. Sands, general freight agent of the defendant railway company, and bears the notation that it is "issued by J. H. Rees, chief of tariff bureau." The division of rates between the barge line and the defendant railway company thus established was not contradicted by any evidence offered upon the trial. But defendant's counsel argues that the schedule is erroneous, and that the words, "5 cents per bushel," should read "5 cents per 100." Defendant's counsel contends that this mistake is conclusively established by the fact that the other schedules show that a rate of 17 cents per hundred was charged from Kenmare, and 22 cents per hundred from the lake points to Minneapolis, Duluth, or Superior, respectively.

The facts established by no means justify the conclusion contended for by defendant's counsel. No evidence was offered to show the local rate from the lake points to Smith's or Kenmare. The only schedules offered in evidence show the rate from Kenmare and the lake points to Minneapolis, Duluth, or Superior respectively, and the division of the joint rate from the lake points to the terminals mentioned between the

barge line and the defendant railway company. The published through rates are presumptively authorized by, and based upon, an agreement between the two carriers. (Judson, Interstate Commerce, 2d ed. § 315.) Except as limited by the provisions of the interstate commerce act, the different carriers are free to adopt or refuse to adopt joint through tariff rates, and have the right to agree to a joint through tariff on terms mutually satisfactory. (Southern P. Co. v. Interstate Commerce Commission, 200 U. S. 536, 50 L. ed. 585, 26 Sup. Ct. Rep. 330.) And the propriety and reasonableness of such rates (and in case of disagreement between the carriers), the proper division thereof as well, are matters to be determined in the first instance by the Interstate Commerce Commission. "Through rates and through billing are matters of agreement among carriers engaged in interstate commerce, excepting where established by order of the [Interstate Commerce] Commission. . . . Through rates are not required to be made on a mileage basis, nor local rates corresponding with the division of a joint through rate over the same line." Judson, Interstate Commerce, 2d ed. § 180. In the recent case of Empire Coke Co. v. Buffalo & S. R. Co. 31 Inters. Com. Rep. 573, 579, it was said: "The Commission has repeatedly held that divisions are matters of agreement among participating carriers, and, while they may be considered as evidence, they are not regarded as conclusive, and ordinarily afford but little basis upon which to determine the reasonableness of joint rates. As we stated in Florida Mercantile Agency v. Pennsylvania R. Co. 21 Inters. Com. Rep. 85, 87: What the public is primarily interested in is the charge for the service rendered, irrespective of the divisions of the rate, and if the rate itself is reasonable and just the fact that it is unequally divided between the participating lines is not a basis for reduction. *There may be many reasons why a particular carrier would be willing to accept a very small proportion of a joint rate in order to secure business,* and it is within its rights in bargaining with its connections for tonnage so long as it does not undertake to haul one class of traffic at rates so low as to thereby burden other traffic." Where a joint rate has been established by order of the Interstate Commerce Commission, and the connecting carriers are unable to agree upon division of the through rates, the Interstate Commerce Commission has held that "such division should be made with respect to earnings of the lines to and from

points of interchange," and that "in establishing equitable divisions it is necessary to have regard for all the surrounding circumstances and conditions." (Rates on Lumber & Other Forest Products, 31 Inters. Com. Rep. 673, 676.)

The schedule in question was offered in evidence by the defendant. The trial court based its order granting a new trial largely thereon. The correctness of the schedule was never challenged by anyone in the court below. There seems to be no good reason why the defendant railway company and the barge line might not lawfully have agreed upon a division of the joint rate on the basis shown therein, and certainly an appellate court cannot accept counsel's argument as conclusive evidence of the incorrectness of a tariff schedule received in evidence, and considered to be correct in the proceedings had in the court below.

The main object of the agreement between the plaintiff and defendant's general agent was to substitute plaintiff as a carrier in lieu of the navigation company. The purpose of this agreement did not contravene any provision of law or public policy. The only part of such agreement that could possibly be violative of law or public policy is the amount of compensation to be paid. There is no contention that any illegal intent existed on the part of either party either to give or receive a rebate. They were dealing with a condition brought about by the failure or inability of the navigation company to carry the grain. The prime object of the arrangement between plaintiff and defendant's general agent was lawful, and any actual intent to effect an unlawful purpose or object is negatived by the testimony and every fact and circumstance in the case. It is true that in order to constitute a violation of the statute a specific criminal intent need not be shown to exist; that moral turpitude or wicked intent is not essential to a conviction; and that the only criminal intent requisite to the offense created by the statute is the purpose to do an act in violation thereof. (See Armour Packing Co. v. United States, 209 U. S. 56, 52 L. ed. 681, 28 Sup. Ct. Rep. 428.) But it is equally true that a contract for a rebate in violation of the interstate commerce act does not invalidate the contract of affreightment, but such contract remains binding upon the carrier. Merchants' Cotton Press & Storage Co. v. Insurance Co. of N. A. 151 U. S. 368, 38 L. ed. 195, 4 Inters. Com. Rep. 499, 14 Sup. Ct. Rep. 367. And it has also been held that it is proper to show

that there was no intent to violate the act, *i. e.,* that there was no intent to do what is prohibited by the act. (Atchison, T. & S. F. R. Co. v. United States, 95 C. C. A. 446, 170 Fed. 250.)

Defendant's counsel concedes that if the division sheet offered in evidence by himself is correct, that then no illegal preference or rebate was granted to the plaintiff, as plaintiff would then merely be receiving the same compensation which the former carrier, the navigation company, had received under the joint tariff arrangement for carrying grain over the same route. Therefore if the division sheet is correct this disposes of the question of preference. But even though the division sheet is erroneous, and the navigation company as a matter of fact was to receive only 5 cents per hundred weight instead of 5 cents per bushel, the facts would still remain that the defendant operated under the traffic arrangement with plaintiff, and billed shipments as originating at the lake points, and concededly collected freight charges from the lake points to the points of destination, and in any event has in its possession at least $247 of moneys which in good conscience belong to the plaintiff. Having participated in the traffic arrangement and come into possession not only of the profits belonging to it under such agreement, but the profits belonging to plaintiff as well, defendant should not be permitted to interpose the objection that the transaction or agreement which produced the fund was in violation of law. McBlair v. Gibbes, 17 How. 232, 15 L. ed. 132; Brooks v. Martin, 2 Wall. 70, 17 L. ed. 732; 9 Cyc. 557 et seq. Plaintiff should in any event be permitted to recover the amount which defendant charged and received from the shipper as freight charges from the lake points to Smith's. The fact that plaintiff happens to be the owner of the grain transported does not necessarily enter into the transaction. Under the evidence in this case he, under an arrangement with defendant's general agent and at his request, did perform the service which a former connecting carrier was no longer able to perform, and as a result of such service the plaintiff has collected the same freight charges which it would have collected if the former connecting carrier had performed such service. This being so, no good reason exists why plaintiff should not recover the same compensation which the former connecting carrier would have received therefor. And under the evidence in this case that is all which he seeks to recover. Whether the defendant could

lawfully enter into a contract to pay the plaintiff a larger sum than that paid to the former carrier, and whether such agreement, if made, would constitute an unlawful preference in the nature of a rebate, is a matter upon which I express no opinion, as the record in this case neither justifies nor requires a decision upon that point.

Fisk, Ch. J. (dissenting).   I respectfully dissent from the conclusion announced by my associates.   My reasons for so doing are briefly as follows:

While the evidence discloses that the witness Cole, through whom plaintiff claimed his contract was made, was a general agent of defendant in his traffic department, it affirmatively appears that he had no authority whatever in the operating department of such road, and therefore was vested with no authority to enter into contracts such as plaintiff alleged was entered into.   Furthermore, the published tariff rate which had been fixed at 22 cents per hundred as the joint tariff from the lake points to the Minnesota terminals, or 5 cents per hundred from such lake points to Kenmare, and 17 cents per hundred from the latter point to such terminals, could not be deviated from in  this way even if Cole had general authority to enter into contracts.   Plaintiff's contention is that he was hired to haul his own grain from the lake points to Kenmare, and deliver it to defendant, at the rate of 5 cents per bushel.   If so, then it seems that defendant must, in effect, have agreed to an illegal rebate from the tariff rate of 17 cents per hundred from Kenmare aforesaid.   As a matter of fact, defendant did not operate as a common carrier between the lake points and Kenmare at all, as its joint schedule of rates discloses, and it is erroneous to say that plaintiff in hauling his grain performed a service for the railway company for which it had a right to pay a reasonable price.   Such joint rate is on the basis of 5 cents per hundred pounds for the navigation company and 17 cents per hundred for the defendant company.

Defendant's counsel at the oral argument conceded that in a proper action plaintiff would be entitled to recover from defendant on the basis of 5 cents per hundred, which is the sum collected by it in excess of its proportion of the joint rate.   As I view it, this is the extent of defendant's liability.